## COMMONWEALTH *vs.* LOUISE WOODWARD
### (and a companion case).

Middlesex. March 9, 1998. - June 16, 1998.

Present: WILKINS, C.J., ABRAMS, LYNCH, GREANEY, FRIED, MARSHALL, & IRELAND, JJ.

*Homicide. Practice, Criminal,* ·Instructions to jury, Lesser included offense, Verdict, Indictment, Dismissal, Required finding, Sentence, Double jeopardy, Disclosure of evidence. *Malice. Jury and Jurors. Judge. Evidence,* Exculpatory, Failure to produce evidence, Judicial notice. *Constitutional Law,* Double jeopardy, Sentence.

At the trial of an indictment for murder in the first degree, the judge erred in refusing to instruct the jury, as requested by the Commonwealth over the defendant's objection, on the lesser included offense of involuntary manslaughter, where the evidence warranted such an instruction; however, the jury's verdict of guilty of murder in the second degree rendered the error harmless. [662-666]

Discussion of a trial judge's authority under Mass. R. Crim. P. 25 (b) (2), to reduce a verdict or to grant a new trial in criminal cases, and statement that this court, in reviewing a judge's action under rule 25 (b) (2), to reduce a verdict or to grant a new trial, would consider only whether the judge abused his discretion or committed an error of law. [666-669]

This court concluded that a trial judge acted within his discretion in reducing a jury's verdict, as more consonant with justice, pursuant to Mass. R. Crim. P. 25 (b) (2), from murder in the second degree to involuntary manslaughter. [669-672]

In a murder case, there was no error in the judge's denial of the defendant's request for a second autopsy, where the defendant did not show cause and specific need for such a procedure. [675-676]

This court declined to hear an issue on appeal that was not fairly raised at trial. [676-677]

In a murder case, the prosecutor and the medical examiner negligently failed to communicate to the Commonwealth's expert neuropathologist the existence of a court order requiring the preservation of forensic evidence and, as a result, certain material evidence was lost; however, neither the Commonwealth's culpability nor the loss was so overwhelmingly prejudicial as to warrant dismissal of the indictment. [677-681]

At a murder trial, the evidence, viewed in the light most favorable to the Commonwealth, was sufficient to enable a rational trier of fact to find the essential elements of the crime beyond a reasonable doubt, and the judge did not err in denying the defendant's motion for a required finding of not guilty. [681-682]

There was no basis for this court to take judicial notice of asserted

"conclusive" scientific evidence and thereupon to set aside a murder conviction. [682-683]

This court has no authority to vacate a lawful sentence imposed by a Superior Court judge on a criminal defendant and to resentence the defendant or to remand the matter for resentencing by another Superior Court judge. [683-690] GREANEY, J., dissenting, with whom ABRAMS and IRELAND, JJ., joined.

INDICTMENT found and returned in the Superior Court Department on March 5, 1997.

The case was tried before *Hiller B. Zobel,* J.

CIVIL ACTION commenced in the Supreme Judicial Court for the county of Suffolk on November 25, 1997.

The case was reported by *Abrams,* J., and the parties' respective cross appeals were consolidated with that report and entered in this court by her.

*Harvey A. Silverglate & Andrew Good (Barry C. Scheck,* of New York, & *Elaine Whitfield Sharp,* with them) for the defendant.

*Sabita Singh,* Assistant District Attorney *(Gerard T. Leone,* Assistant District Attorney, with her) for the Commonwealth.

MARSHALL, J. On the afternoon of February 4, 1997, an eight month old child, Matthew Eappen, was rushed to Children's Hospital in Boston with a severe head injury. Despite emergency treatment, Matthew's condition deteriorated, and he died on February 9, 1997. On March 5, 1997, a Middlesex County grand jury returned an indictment against the defendant, Louise Woodward, for the murder of Matthew. She subsequently was ordered held without bail. Woodward had worked as an au pair for the Eappen family since November, 1996. Matthew was in Woodward's sole care from the morning of February 4, on the departure of Matthew's mother for work, until he was taken to the hospital.

Trial on the murder charge against Woodward commenced on October 6, 1997. After a three-week trial, the judge gave the jury instructions on murder in the first and second degrees. At Woodward's request and over the Commonwealth's objection, the judge did not instruct the jury on manslaughter.[1] On October 30, 1997, the jury returned a guilty verdict of murder in the

---

[1]On October 27, 1997, before the case was sent to the jury, the Commonwealth challenged pursuant to G. L. c. 211, § 3, the judge's refusal to

second degree. On the following day, the judge imposed the statutorily mandated term of life in prison.

On November 10, 1997, after hearing argument on Woodward's motion for postjudgment relief, the judge reduced the jury's verdict from murder to involuntary manslaughter, acting pursuant to Mass. R. Crim. P. 25 (b) (2), 378 Mass. 896 (1979), and vacated the life sentence. He denied Woodward's request for a required finding of not guilty or for a new trial. In a hearing that same afternoon after release of his memorandum and order reducing the verdict and vacating Woodward's sentence, the judge imposed a sentence of 279 days for Woodward's manslaughter conviction, that sentence being deemed served by Woodward while incarcerated awaiting trial and while awaiting action on her postconviction motion.

The Commonwealth and Woodward filed cross appeals. The Commonwealth then sought relief before a single justice, pursuant to G. L. c. 211, § 3.[2] The single justice reserved and reported the case without decision to the full court, and ordered the parties' respective cross appeals be consolidated with that reservation and report and entered in this court. The Commonwealth here seeks reinstatement of the jury's verdict of murder in the second degree. In the alternative, the Commonwealth asks that we exercise our general superintendence power, G. L. c. 211, § 3, and resentence Woodward ourselves or remand the case to the Superior Court for reconsideration of Woodward's rule 25 (b) (2) motion or for resentencing by another judge. Woodward appeals from the judge's refusal to dismiss the indictment and his denial of her motion for a required finding of not guilty. She also raises a number of other claimed trial errors, but waives them if we should uphold the judge's reduction of the verdict from murder to involuntary manslaughter, and the sentence he imposed.

give a manslaughter instruction before a single justice of this court, who denied the Commonwealth's requested relief without a hearing.

[2]The Commonwealth sought a stay, pending appeal, of the judge's order reducing the jury verdict of murder in the second degree to manslaughter and of Woodward's time-served sentence imposed by the judge, and an order reinstating the jury verdict of murder in the second degree. In the alternative, the Commonwealth sought to vacate the posttrial order and sentence, and a new ruling on Woodward's motion to reduce the jury verdict or an order remanding Woodward's motion to reduce the jury verdict to the Superior Court for a hearing and determination by another judge.

## I. THE COMMONWEALTH'S APPEAL

The Commonwealth argues that the judge abused his discretion in reducing the jury's verdict from murder to a manslaughter conviction. It points out that he should not have declined the Commonwealth's request for a manslaughter instruction. It argues that these errors,[3] in combination, impaired the integrity of the justice system and require that, pursuant to our extraordinary power of superintendence over the lower courts, we vacate the judge's postverdict order and restore the jury's verdict of murder in the second degree and the resulting mandated life sentence.

1. *The jury instructions.* The Commonwealth presented evidence that the cause of Matthew's death was severe head trauma inflicted on February 4, 1997, while he was in the sole custody of Woodward.[4] The Commonwealth sought jury instructions on murder in the first degree on a theory of extreme atrocity or cruelty,[5] murder in the second degree, and on the lesser included offense of involuntary manslaughter. Woodward objected to the last request, and asked that the jury be limited to considering the offense of murder. The judge acceded to her request.[6] This was error. We have stated repeatedly that, "[w]hen the evidence permits a finding of a lesser included offense, a

---

[3]The Commonwealth may not now, postconviction, challenge the judge's jury instructions. As noted above, note 1, *supra*, prior to the conviction the Commonwealth appealed to a single justice for interlocutory relief from the judge's decision to decline a manslaughter instruction. The Commonwealth did not appeal from the single justice's order denying relief. See S.J.C. Rule 2:21, 421 Mass. 1303 (1995). We therefore address here the Commonwealth's claimed error in the jury instructions only on the grounds of the Commonwealth's over-all argument that the judge abused his discretion in refusing an instruction on manslaughter and then reducing Woodward's conviction to manslaughter.

[4]The Commonwealth presented evidence, contested by Woodward, that the head injury resulted from a contemporaneous combination of violent shaking of the child's body and a forceful slamming of his head against a fixed, hard object.

[5]"Murder committed with deliberately premeditated malice aforethought, or with extreme atrocity or cruelty, or in the commission or attempted commission of a crime punishable with death or imprisonment for life [felony-murder] is murder in the first degree. Murder which does not appear to be in the first degree is murder in the second degree." G. L. c. 265, § 1.

[6]The dissent claims that this case is set apart from most because of Woodward's strategy of "knowingly and voluntarily [agreeing] to the choices that would be given to the jury." *Post* at 691. We have never said that a defendant's

judge must, upon request, instruct the jury on the possibility of conviction of the lesser crime." *Commonwealth* v. *Gould,* 413 Mass. 707, 715 (1992). See *Commonwealth* v. *Hobbs,* 385 Mass. 863, 871 (1982); *Commonwealth* v. *Richmond,* 379 Mass. 557, 562 (1980); *Commonwealth* v. *Campbell,* 352 Mass. 387, 392 (1967). We have never limited this rule to requests made by the defendant, nor have we ever held that the Commonwealth is not entitled, evidence permitting, to such an instruction on request.[7]

This issue has arisen on appeal most often in cases in which the defendant requested an instruction on a lesser included offense. In the only case of which we are aware concerning the Commonwealth's request for a lesser included instruction, which presented the converse of the question here, we affirmed a judge's allowance of the request over the defendant's objection. *Commonwealth* v. *Thayer,* 418 Mass. 130, 132-133 (1994). See *Commonwealth* v. *Matos,* 36 Mass. App. Ct. 958, 962 (1994) (defendant does not have absolute right to make tactical decisions that determine which theories of criminal liability are submitted to jury); *Commonwealth* v. *Vasquez,* 27 Mass. App. Ct. 655, 660 (1989) (test to determine if instruction on lesser included offense required does not depend on whether defendant or Commonwealth objects, but rather whether evidence supports

gamble on an "all-or-nothing" strategy creates a "structural flaw" in the trial. To the contrary, cases hold that in certain circumstances a defendant may make such a choice. See *Commonwealth* v. *Roberts,* 407 Mass. 731, 737 (1990); *Commonwealth* v. *Pagan,* 35 Mass. App. Ct. 788, 791-792 (1994). On other occasions, we have said that such a strategy is "irrelevant" to whether a judge should charge on a lesser included offense. *Commonwealth* v. *Jackson,* 419 Mass. 716, 725 n.8 (1995).

[7]The *Roberts* case, *supra,* does not stand for the proposition, as the judge seemed to believe, that the defendant has an unqualified right to elect, evidence permitting, whether or not the jury receive a lesser included instruction. In that case, the Commonwealth did not request an instruction on the lesser included offense of larceny, and we held that a judge is not required to charge on the lesser crime, if there is *no* request. In such circumstances, we said, a judge commits no error by respecting a defendant's strategy to submit "an all-or-nothing choice to the jury." *Id.* The judge also relied on *Pagan, supra,* an Appeals Court decision, holding that a judge, confronted with a defense strategy not to seek a manslaughter instruction, "has no duty to undercut such a strategy by giving an instruction which the defendant on appeal would surely argue tempted the jury to a compromise verdict adverse to the defendant." *Id.* at 792. While there does not appear to have been any request from the Commonwealth for a manslaughter instruction in that case, we disavow dictum that may suggest that the judge must honor, in the face of the Commonwealth's objection, the defendant's choice not to have a manslaughter instruction.

such instruction). Here, a disputed element — malice — distinguishes murder, the greater offense, from manslaughter, the lesser offense, and an instruction should have been given. Consideration of lower court denials of prosecutors' requests for instructions on lesser included offenses would not reach us except in the unlikely procedural circumstances of this case, because the Commonwealth has no reason to appeal from a conviction, and is barred by double jeopardy principles from appealing from an acquittal. See *Commonwealth* v. *Therrien*, 383 Mass. 529, 532 (1981). Authorities elsewhere hold overwhelmingly that the prosecution has a right to jury instructions on lesser included offenses, on request, if the evidence so warrants, in spite of a defendant's objection.[8] As far as we are aware, no jurisdiction that has considered the issue has allowed a defendant to veto a lesser included offense instruction properly requested by the prosecution.

Our conclusion that the Commonwealth was entitled to a manslaughter instruction is fortified by the policy favoring instructing juries on lesser included offenses. The doctrine serves the public purpose of allowing the jury to convict of the offense established by the evidence, rather than forcing them to choose

[8]See, e.g., *Schmuck* v. *United States*, 489 U.S. 705, 717 & n.9 (1989), citing *Beck* v. *Alabama*, 447 U.S. 625, 633 (1980) (Fed. R. Crim. P. 31 [c] "suggests that a lesser included offense instruction is available in equal measure to the defense and to the prosecution," and notes that the rule "developed as an aid to the prosecution in cases in which the proof failed to establish some element of the crime charged"). See also *State* v. *Cruz*, 189 Ariz. 29, 33 (1996); *State* v. *Jones*, 321 Ark. 451, 455 (1995); *People* v. *Bradford*, 15 Cal. 4th 1229, 1344 (1997), cert denied, 118 S. Ct. 1976 (1998); *People* v. *Garcia*, 940 P.2d 357, 361 (Colo. 1997); *State* v. *Gibson*, 682 So. 2d 545, 547 (Fla. 1996); *State* v. *Kupau*, 76 Haw. 387, 394 (1994); *State* v. *Curtis*, 130 Idaho 522, 523-524 (1997); *People* v. *Ivory*, 217 Ill. App. 3d 619, 623-625 (1991); *State* v. *Wallace*, 475 N.W.2d 197, 199 (Iowa 1991); *State* v. *Baacke*, 261 Kan. 422, 434 (1997); *Hagans* v. *State*, 316 Md. 429, 453-454 (1989); *People* v. *Torres*, 222 Mich. App. 411, 416-417 (1997); *Pleasant* v. *State*, 701 So. 2d 799, 800, 804 (Miss. 1997); *State* v. *Maynard*, 954 S.W.2d 624, 629-631 (Mo. Ct. App. 1997); *State* v. *Swan*, 279 Mont. 483, 488 (1996); *State* v. *Pribil*, 224 Neb. 28, 35-36 (1986); *State* v. *Brent*, 137 N.J. 107, 116-117 (1994); *State* v. *Meadors*, 121 N.M. 38, 47 (1995); *State* v. *Sheldon*, 301 N.W.2d 604, 608 (N.D. 1980), cert. denied, 450 U.S. 1002 (1981); *State* v. *Schmidt*, 100 Ohio App. 3d 167, 171 (1995); *State* v. *Cunnningham*, 320 Or. 47, 58 (1994), cert. denied, 514 U.S. 1005 (1995); *Arevalo* v. *State*, 943 S.W.2d 887, 890 (Tex. Crim. App. 1997); *State* v. *Wallace*, 175 W. Va. 663, 667 (1985); *State* v. *Fleming*, 181 Wis. 2d 546, 554-555 (Ct. App. 1993); *State* v. *Keffer*, 860 P.2d 1118, 1134 (Wyo. 1993).

between convicting the defendant of an offense not fully established by the evidence or acquitting, even though the defendant is guilty of some offense. *Commonwealth* v. *Walker,* 426 Mass. 301, 305 (1997).[9] Here, it was peculiarly inappropriate for the judge to refuse to charge the jury on manslaughter when, as revealed by his subsequent order reducing the jury's verdict, in his view the evidence was not consonant with a conviction of murder. The jury, in reaching their verdict, surely must have concluded that the Commonwealth had proved beyond a reasonable doubt the element of causation — that Woodward's acts caused Matthew's fatal injury. By refusing to accede to the Commonwealth's request for a manslaughter instruction, the judge impermissibly prevented the jury from considering a lesser degree of culpability for Woodward.

The judge's error, however, did not prejudice the Commonwealth's case against Woodward in the final analysis. The Commonwealth concedes that the jury's verdict rendered the error harmless. See *Commonwealth* v. *Matos,* 36 Mass. App. Ct. 958, 962 (1994) (no prejudice where jury instructed, over defendant's objection, on involuntary manslaughter and defendant convicted of murder in the second degree). If the judge had honored the Commonwealth's request and the jury had received the manslaughter instruction but had declined to choose that option, the judge could still have reduced the jury's murder verdict under rule 25 (b) (2). See, e.g., *Commonwealth* v. *Gaulden,* 383 Mass. 543, 552 (1981). Alternatively, had the

---

[9]Woodward argued that providing a jury with multiple options of guilty verdicts on successively less serious crimes or degrees of culpability may prejudice a defendant by inviting a jury to choose a compromise verdict unwarranted by the evidence. If a lesser included offense is not supported by the evidence, the judge should refuse to give such an instruction. See *Commonwealth* v. *Vasquez,* 27 Mass. App. Ct. 655, 660 (1989). A judge may also enter a finding of not guilty, if the Commonwealth has presented insufficient evidence to support the offense charged in the indictment. See Mass. R. Crim. P. 25 (a), 378 Mass. 896 (1979). Because the judge has the power to control what charges go to the jury, the risk to a defendant of a "compromise" verdict is minimized and any potential abuse from prosecutors "overcharging" defendants is checked. Here, the judge considered whether the Commonwealth inappropriately prosecuted the case on a theory of murder in the first degree, and concluded that "[t]he evidence in this case sufficed, however thinly, to support an indictment alleging extreme cruelty [or] atrocity," and that the medical evidence permitted "the prosecution consistently [to] urge[] first-degree murder" at trial. Thus, the judge apparently determined that the Commonwealth had presented sufficient evidence to submit the matter to the jury.

jury been given such a choice and returned a manslaughter verdict, the trial's outcome would have yielded the same conviction of Woodward as the judge's postverdict order.

2. *Rule 25 (b) (2) reduction in verdict.* General Laws c. 278, § 11, provides in part that "the judge may on a renewed motion for a directed verdict of not guilty pursuant to the Massachusetts Rules of Criminal Procedure set aside the verdict and order a new trial, or order the entry of a finding of guilty of any offense included in the offense charged in the indictment or complaint." Rule 25 (b) (2) incorporates this statutory authority.[10] The authority of the trial judge under rule 25 (b) (2) to reduce the verdict or grant a new trial in criminal cases is much like our authority to review so-called capital cases — convictions of murder in the first degree — under G. L. c. 278, § 33E. See *Commonwealth* v. *Carter*, 423 Mass. 506, 513 (1996); *Commonwealth* v. *Gaulden*, 383 Mass. 543, 553 & n.7 (1981).

The postconviction powers granted by the Legislature to the courts at both trial and appellate levels reflect the evolution of legislative policy promoting judicial responsibility to ensure that the result in every criminal case is consonant with justice. See *Gaulden, supra* at 553-554 & n.7; *Commonwealth* v. *Brown*, 376 Mass. 156, 167-168 (1978); *Commonwealth* v. *Baker*, 346 Mass. 107, 109 (1963).[11] It is clear that the responsibility may be exercised by the trial judge, even if the evidence warrants the jury's verdict. "[A] new trial or verdict reduction may be proper even when the evidence can legally support the jury's verdict." *Commonwealth* v. *Carter, supra* at 512. See *Commonwealth* v. *Ghee*, 414 Mass. 313, 321 (1993) (reduction in verdict not based on absence of evidence warranting jury's

[10]Rule 25 of the Massachusetts Rules of Criminal Procedure, entitled "Motion for Required Finding of Not Guilty," states in part that "the judge may on motion set aside the verdict and order a new trial, or order the entry of a finding of not guilty, or order the entry of a finding of guilty of any offense included in the offense charged in the indictment or complaint."

[11]Prior to 1939, only a trial judge could order a new trial, but had no power to reduce a jury verdict. G. L. (Ter. Ed.) c. 278, § 33E. In 1939, the Legislature granted to this court the power to consider the facts of a capital case, as well as the law, and authorized us to order a new trial if justice so required. St. 1939, c. 341. In 1962, the Legislature further authorized us to consider a defendant's degree of guilt and order a reduction in the verdict in appropriate capital cases, in lieu of a new trial. St. 1962, c. 453. In 1979, the Legislature granted trial judges the power to enter a finding of guilty of any lesser included offense in all criminal cases. G. L. c. 278, § 11, as appearing in St. 1979, c. 344, § 43A.

finding of deliberate premeditation but because more consonant with justice); *Commonwealth* v. *Keough*, 385 Mass. 314, 319-321 (1982) (jury's verdict of guilty of murder warranted by evidence, but reduction to manslaughter upheld because more consonant with justice). The judge's option to reduce a verdict offers a means to rectify a disproportionate verdict, among other reasons, short of granting a new trial. *Gaulden, supra* at 556. The judge's power under rule 25 (b) (2), like our power under G. L. c. 278, § 33E, may be used to ameliorate injustice caused by the Commonwealth, defense counsel, the jury, the judge's own error, or, as may have occurred in this case, the interaction of several causes. See, e.g., *Commonwealth* v. *Millyan*, 399 Mass. 171, 188-189 (1987) (judge's failure to instruct on intoxication because defendant did not so request and such instruction was inconsistent with defense strategy was nonetheless, in light of evidence on intoxication, appropriate justification for judge to reduce verdict).

Because such broad postconviction authority is vested in the trial judge, we have counseled that a judge should use this power sparingly, *Keough, supra* at 321, and trial judges have in fact used their rule 25 (b) (2) power infrequently. Since 1979, the Commonwealth has appealed verdict reductions in only ten cases, of which seven were affirmed.[12] We see no evidence of any generalized abuse of the power vested in trial judges since the rule's adoption. Nor do we see any other reason to modify

---

[12]We have surveyed the opinions of this court and the Appeals Court since the 1979 amendment to G. L. c. 278, § 11, that gave trial judges for the first time the power to enter a finding of guilty of any lesser included offense in all criminal cases. St. 1979, c. 344, § 43A. We have identified only the following ten cases in which the Commonwealth appealed from verdict reductions ordered by trial judges:

| Commonwealth v. | Jury Verdict | Judge's Reduction | Action on Appeal |
|---|---|---|---|
| *Ghee*, 414 Mass. 313 (1993) | 1st Degree | 2d Degree | Affirmed |
| *Sabetti*, 411 Mass. 770 (1992), cert. denied, *Sabetti* v. *Dipaolo*, 513 U.S. 916 (1994) | Trafficking in cocaine | Possession with intent to distribute | Conviction Reinstated |
| *Cobb*, 399 Mass. 191 (1987) | 2d Degree | Manslaughter | Affirmed |

case law that we have developed since 1979 following legislative authorization of the rule.

In convictions of murder in the first degree, we are authorized to review a whole case, including the evidence. G. L. c. 278, § 33E. In a noncapital case such as this, we do not conduct an independent analysis when a trial judge reduces a verdict to a lesser offense. *Gaulden, supra* at 557.[13] Our review of a trial judge's exercise of his authority under rule 25 (b) (2) is more constrained: "In assessing a trial judge's decision to reduce a verdict under [that rule], 'we consider only whether the judge abused his discretion or committed an error of law.' " *Commonwealth* v. *Millyan, supra* at 188, quoting *Gaulden, supra*. "We defer to the trial judge because he has the advantage of face to face evaluation of the witnesses and the evidence at trial. He is in a far better position than we are to make the judgment required by the rule." *Commonwealth* v. *Cobb*, 399 Mass. 191, 192 (1987), citing *Gaulden, supra*. We. have made it clear that under rule 25 (b) (2), a judge may review all the evidence, including the defendant's version of the facts, in deciding whether the verdict comports with justice, even when the evidence warranted the jury's verdict. See *Ghee, supra* at 321-322; *Keough, supra* at 319. Indeed, "the judge is not foreclosed

| *Millyan*, 399 Mass. 171 (1987) | 1st Degree | 2d Degree | Affirmed |
|---|---|---|---|
| *Aguiar*, 400 Mass. 508 (1987) | 1st Degree | Voluntary Manslaughter | Reversed (on other grounds) |
| *Keough*, 385 Mass. 314 (1982) | 2d Degree | Manslaughter | Affirmed |
| *Gaulden*, 383 Mass. 543 (1981) | 2d Degree | Manslaughter | Affirmed |
| *Burr*, 33 Mass. App. Ct. 637 (1992) | Trafficking in cocaine | Possession with intent to distribute | Convictions Reinstated |
| *Greaves*, 27 Mass. App. Ct. 590 (1989) | 2d Degree | Manslaughter | Affirmed |
| *Zitano*, 23 Mass. App. Ct. 403 (1987) | 2d Degree | Manslaughter | Affirmed |

[13]We would undertake an independent analysis under G. L. c. 278, § 33E, if a judge denied a defendant's motion for a reduction in verdict from murder in the first degree. See *Gaulden, supra* at 557 n.10.

from considering the defendant's testimony . . . and, if he believes it, relying on it." *Keough, supra* at 321. The Commonwealth's complaint in this case, that the judge "substituted" his view of the evidence for that of the jury, is no reason to overrule his decision to reduce the verdict. See *Ghee, supra* at 321 (Commonwealth's argument that judge erred in reducing verdict where there was evidence supporting verdict of murder in first degree characterized as "meritless" and "miss[ing] the point").

We do expect a judge to state the reasons for a reduction in verdict. *Gaulden, supra* at 556. In this case, the judge has done so. After "[v]iewing the evidence broadly," in accordance with his accurate understanding of rule 25 (b) (2) powers, the judge gave as his first reason for the reduction that "the circumstances in which [Woodward] acted were characterized by confusion, inexperience, frustration, immaturity and some anger, but not malice (in the legal sense) supporting a conviction for second degree murder." See *Keough, supra* at 320 (affirming judge's reduction to manslaughter where judge found "that the circumstances in which the defendant acted were characterized by fear, confusion, and anger, and that the necessary element of malice for second degree murder was absent"). We detect no error of law with regard to malice in this conclusion. A fine line distinguishes murder based on the third prong of malice from the lesser included offense of involuntary manslaughter.[14] "The difference between the elements of the third prong of malice

---

[14]"Malice" is the element that distinguishes murder from manslaughter. See *Commonwealth* v. *Skinner*, 408 Mass. 88, 93 (1990), and cases cited. "Without malice, an unlawful killing can be no more than manslaughter." *Commonwealth* v. *Judge*, 420 Mass. 433, 437 (1995). "Malice as an element of murder may be proved by evidence establishing any one of three facts beyond a reasonable doubt: if, without justification or excuse, (1) the defendant intended to kill the victim (the so-called first prong of malice), or (2) the defendant intended to do the victim grievous bodily harm (the second prong), or (3) in the circumstances known to the defendant, a reasonably prudent person would have known that, according to common experience, there was a plain and strong likelihood that death would follow the contemplated act (the third prong). *Commonwealth* v. *Grey*, 399 Mass. 469, 470 n.1 (1987)." *Commonwealth* v. *Sneed*, 413 Mass. 387, 388 n.1 (1992). In this case, the jury received an instruction on the third prong of malice only, and must, therefore, have returned their verdict after finding that, in the circumstances known to Woodward, a reasonably prudent person would have known that, according to common experience, there was a plain and strong likelihood that Matthew's death would follow her actions.

and . . . involuntary manslaughter lies in the degree of risk of physical harm that a reasonable person would recognize was created by particular conduct, based on what the defendant knew. The risk for the purposes of the third prong of malice is that there was a plain and strong likelihood of death. . . . The risk that will satisfy the standard for . . . involuntary manslaughter 'involves a high degree of likelihood that substantial harm will result to another.' " *Commonwealth* v. *Sires*, 413 Mass. 292, 303-304 n.14 (1992), quoting *Commonwealth* v. *Welansky*, 316 Mass. 383, 399 (1944).

Although evidence of a single blow to a child of tender years may be sufficient to support a jury finding of malice, *Commonwealth* v. *Starling*, 382 Mass. 423, 426 (1981), such an inference is not *necessarily* required by evidence even of repeated blows to a young child. *Commonwealth* v. *Vizcarrondo, ante* 392, 397-398 (1998). In all the reported murder and manslaughter convictions in Massachusetts involving the battery of young children there was compelling evidence of multiple injuries from repeated instances of caretaker abuse, not death caused by a single fatal blow. See, e.g., *Commonwealth* v. *Day*, 409 Mass. 719, 720-721, 723-726 (1991) (manslaughter conviction reversed on erroneous admission of "profile" testimony); *Commonwealth* v. *Hutchinson*, 395 Mass. 568, 573-575 (1985) (murder in the first degree affirmed).[15] The Commonwealth did not claim that Woodward had ever abused or injured Matthew prior to the fatal injury.[16] Where there was no evidence in this case of repeated caretaker abuse, the judge did not abuse his discretion in concluding that the jury verdict of murder was not proportionate with convictions in other cases, including those cases resulting in convictions of manslaughter rather than murder. See *Gaulden, supra* at 556 (whether jury verdict is "markedly inconsistent" with verdicts returned in similar cases

---

[15]In our survey of all reported cases of fatal battery of children, only in *Commonwealth* v. *Starling*, 382 Mass. 423, 425-427 (1981), was there no evidence in the record of prior injuries or a pattern of abuse, although in that case evidence of the fatal battery itself could have warranted a finding of multiple severe blows to the child.

[16]There was evidence of a healing fracture to Matthew's wrist. There was no evidence that Woodward was responsible for this injury, and the Commonwealth never claimed as much.

is appropriate consideration in deciding rule 25 [b] [2] motion).[17]

This jury, of course, were given no option to find a lesser degree of culpability than malice sufficient to support murder. "[W]e have applied § 33E to reduce verdicts (or order new trials) when judges have omitted to charge on critical themes that might have affected juries and brought about different verdicts." *Commonwealth v. King*, 374 Mass. 501, 508 (1978). This judge did not charge on an issue that might have brought a different verdict. To correct his own error, he could conclude that a verdict of manslaughter was more "consonant with justice" than letting the murder verdict stand. *Keough, supra* at 320, quoting *Commonwealth v. McCarthy*, 375 Mass. 409, 416 (1978).

The judge suggested an alternative basis for reaching a manslaughter conviction, one that credited Woodward's experts, in part, on the causation of Matthew's injury. Under this view of reconciling the conflicting evidence on causation, Matthew had a preexisting skull fracture and blood clot, and Woodward handled Matthew "roughly," which caused the clot to "rebleed," leading to his death. Weighing the evidence in such a way would permit the jury, had they been given the option, to find that Woodward committed a battery, fatal because of Matthew's condition at the time, but not because of a severe blow by Woodward, and thus without malice sufficient for murder. We need not concur with this or any other view of the evidence on causation in order to defer to the judge's discretion so to weigh the evidence and reach his decision that the evidence as a whole "comported more closely" with manslaughter than with murder.[18] *Keough, supra* at 320, quoting *Commonwealth v. McCarthy*, 375 Mass. 409, 416 (1978).

---

[17]The dissent does not take issue with our conclusion that there was no error in the judge's verdict reduction under rule 25 (b)(2). *Post* at 692.

[18]The Commonwealth attacks the judge's reasons for reaching manslaughter because his "unparticularized finding that the defendant was 'a little rough' with the baby fails . . . altogether to describe an act which has a high degree of likelihood that substantial harm would result." We do not agree that the judge made a "finding" that Woodward was only "a little rough" in handling Matthew. Rather, in analyzing whether Woodward acted with malice, he quoted her testimony, letting Woodward's words speak for themselves. Her words suggest a range of possible force with which she may have handled Matthew, from which a jury, judge, or reviewing court could draw various conclusions, including that her testimony minimized the amount of force actu-

Finally, we comment on the Commonwealth's criticism of the judge for overstepping his role. This criticism depends on, but goes beyond, the Commonwealth's more specific objections to the judge's refusal of the manslaughter instruction and his verdict reduction. Those actions, in combination, appear to the prosecution to have manipulated the trial's outcome and marginalized the jury, all to Woodward's benefit. The Commonwealth's argument is not frivolous.

Jurors bring the unique perspective of laypersons, representing the wider community's judgment of a defendant's degree of culpability, if any, for her actions. "The importance that our system attaches to trial by jury derives from the special confidence we repose in a 'body of one's peers to determine guilt or innocence as a safeguard against arbitrary law enforcement.' *Williams* v. *Florida*, 399 U.S. 78, 87 (1970). It is this safeguarding function, preferring the commonsense judgment of a jury as a bulwark 'against the corrupt or overzealous prosecutor and against the compliant, biased, or eccentric judge,' that lies at the core of our dedication to the principles of jury determination of guilt or innocence." *Johnson* v. *Louisiana*, 406 U.S. 356, 373-374 (1972), quoting *Duncan* v. *Louisiana*, 391 U.S. 145, 156 (1968). The integrity of the process by which we determine guilt may be jeopardized if the special confidence that the public bestows on a jury's verdict is undermined.

We do not penalize the defendant for the error by the judge in this trial. See *Commonwealth* v. *Millyan*, 399 Mass. 171, 188 (1987). We uphold this judge's reduction in verdict because, from our reading of the transcript and our review of all other reported murder and manslaughter convictions involving the battery of young children, we conclude that the judge acted within his discretion in determining that a conviction of manslaughter was more consonant with justice than a conviction of murder.

---

ally inflicted and that her rough handling actually was sufficient to endanger a baby's life. In the judge's second reference, in his analysis of alternative causation, the judge does not quote Woodward's exact words, but suggests that Woodward "*did* handle [Matthew] roughly" (emphasis in original). As for the broader thrust of the Commonwealth's argument that "a little rough" handling fails to meet the measure of battery sufficient to support manslaughter, such a conclusion does not help the Commonwealth justify restoration of the murder verdict, but rather would warrant a verdict reduction to the even lesser included offense of assault and battery.

## II. The Defendant's Appeal

Woodward argues eight issues, only two of which need concern us: if we affirm the judge's verdict reduction and sentence, she waives all claims that seek a new trial, the appropriate relief were we to agree with Woodward on any of her other six claims of error.[19] We address and reject her claims seeking dismissal of the indictment or a required finding of not guilty.

1. *The loss or suppression of evidence.* Woodward requests the "drastic remedy" of dismissing the indictment, *Commonwealth* v. *Lam Hue To*, 391 Mass. 301, 314 (1984), due to the claimed failure of the Commonwealth to provide her access to potentially exculpatory evidence, and due to the loss of potentially exculpatory tissue obtained during the autopsy by the medical examiner. Woodward's defense relied substantially on a theory that Matthew suffered from a previous head injury, incurred some weeks prior to his death, that began to bleed again on the fateful day of his hospitalization.[20] The unavailable physical evidence that may have proved useful to this theory

---

[19]Woodward's other claims of error are that (1) the judge refused the jury's request during deliberations to have a portion of testimony read back to them; (2) conviction of murder based on third prong malice without requiring a jury also to find that Woodward was subjectively aware of the risk of death from her actions violates fundamental common law principles of moral culpability underlying "the homicide grading system"; (3) the judge provided a spontaneous, supplemental jury instruction that, in contrast to earlier instructions, omitted the temporal element of the Commonwealth's burden of proof — the date on which the defendant's actions caused Matthew's death; (4) the judge refused to instruct the jury that the Commonwealth had the burden of disproving that the homicide was accidental; (5) the judge denied Woodward's motion to admit the results of her polygraph examination; and (6) the judge refused to question prospective jurors as to their knowledge of and attitudes toward one of Woodward's defense counsel because of his prior work as defense counsel in a controversial murder trial.

[20]Woodward's experts testified, in part, that a violent shaking and impact against a flat, hard surface, causing a severe shaken-impact injury, could not have happened because Matthew exhibited no accompanying neck, spinal, or other bodily injury, because there was no evidence of soft tissue subgaleal (scalp) swelling at the fracture site commensurate with a recent violent impact even on a sensitive, preoperative CAT (computerized axial tomography) scan, and because there was no broken skin. In addition, the presence of serum observed by the neurosurgeon who removed the subdural hematoma was confirmation, she argues, of an older injury.

includes a clot of blood (fatal subdural hematoma)[21]; the skull fracture[22]; two sections of dura[23]; and subgaleal (scalp) tissue.[24] Our cases concerning the Commonwealth's failure to disclose or preserve exculpatory evidence have not considered the special circumstances attendant on a defendant's request for

[21]The clot was removed during the initial surgery Matthew underwent at the Children's Hospital and was not preserved. Woodward introduced opinion testimony that the clot could have been preserved for later neuropathological evaluation. She does not press the issue here.

[22]A two and one-half inch fracture of the skull was identified in X-rays by treating physicians only after the emergency surgery. The fracture was examined more fully in the autopsy. Although Dr. Gerald Feigin, the forensic pathologist who performed the autopsy, removed and preserved various tissue, a section of the skull with the fracture was not preserved and was presumably released along with the body to Matthew's family for burial. X-ray images of the skull fracture were taken before, but not after, Matthew's death. One of Woodward's medical experts, Dr. Michael Baden, testified that X-rays of the fracture taken after death would have revealed any healing processes evidencing the age of injury more clearly than X-rays taken before Matthew's death. In addition, photographs were taken of the skull fracture. Although some of these photographs were available to Woodward during discovery, the medical examiner's office produced eighteen additional photographs late in the trial on Friday, October 24, 1997, shortly before the final day of testimony on Monday, October 27, 1997. Two of these photographs were sharply focused close-ups of the fracture and showed its edges more clearly than other previously produced evidence. The judge allowed Dr. Baden, one of two available expert witnesses for Woodward, to return and testify concerning these photographs. Dr. Baden pointed out what he detected as signs of healing on the edges of the fracture, that, in his opinion, indicated an older injury.

[23]The dura is a tough, fibrous tissue lining the inside of the skull. During neuropathological examination of preserved dura tissue after the autopsy, a member of the neuropathological team cut out two sections, approximately three by four centimeters each, one from the right side of the dura immediately above the subdural hematoma and a second from the left side of the dura. A thin slice of the section from the right side was preserved and one slide from this slice was provided to Woodward. Dr. Umberto DeGirolami, the neuropathologist working with the medical examiner's office, testified in a pretrial hearing that the remainder of the right side section and the left side section had been discarded. At trial, Dr. DeGirolami testified that the sections had not been discarded, that he had been able to "reconstruct" the dura and that no pieces were missing. The neuropathologist testifying for Woodward, Dr. Jan Leestma, after reviewing the "reconstruction," maintained that pieces of dura were missing.

[24]Dr. Feigin testified to the presence of a hemorrhage in the scalp close to the fracture site. Dr. Baden, Woodward's expert, concluded from preoperative and postoperative CAT scans that the hemorrhage was an artifact of the surgery to save Matthew's life and was not present when Matthew was admitted to the hospital.

access to, and the Commonwealth's responsibility for preserving, physical evidence from a homicide victim's body. We review briefly the circumstances of Woodward's claims.

Dr. Gerald Feigin conducted an autopsy on February 10, 1997. The body was sent to Worcester for further radiological testing on February 11, and was released to Matthew's family on February 13. On February 11, Woodward filed a motion in the Newton Division of the District Court Department for an "independent," second autopsy by her medical experts.[25] That motion was denied. A second, contemporaneous motion that "all evidence in the possession, custody, or control of the Commonwealth concerning this case be preserved and that no further scientific testing be performed without first notifying [the defendant]" was allowed in part by the judge; he ordered the Commonwealth to preserve all evidence acquired by the medical examiner, but declined to prohibit further testing without notice to Woodward.[26] Woodward challenges the motion denying a second autopsy. She also contends that the Commonwealth suppressed exculpatory evidence when the Commonwealth did not disclose to her the existence of a fracture in Matthew's skull in a sufficiently timely way to enable Woodward's expert to investigate the age of the fracture. We first address these issues.

General Laws c. 38, § 4, authorizes the medical examiner to take jurisdiction of a body and perform an autopsy when he is of the opinion that a death was "due to violence." After investigation or examination by the medical examiner's office, "the body shall be released to the person with the proper legal authority to receive it, including the surviving spouse, the next of kin, or any friend of the deceased, who shall have priority in the order named." G. L. c. 38, § 13. While we do not interpret this statute to prohibit in all circumstances a request such as the defendant's, the statute's silence on this issue certainly does not support any statutorily based right of a defendant to have access to a victim's body for an independent autopsy. Rather, the statute's explicit acknowledgment of a legal right of others to the body after the medical examiner completes his duties indicates that whatever due process right a defendant may claim

---

[25]Woodward proposed that her expert examine the body "under the auspices of the Medical Examiner's Office," and did not seek to remove the body to another location.

[26]The District Court judge who ruled on these early pretrial motions is not the Superior Court judge who tried the case.

must be balanced against statutory, as well as common-law and constitutional, rights to the body of a victim's immediate family.

Another consideration also constrains a defendant's unlimited access for purposes of a second autopsy. Autopsy procedures are inherently destructive, making second autopsies to some extent impracticable. The medical examiner, statutorily independent of law enforcement agencies, is charged with the responsibility of developing objective information as to a cause of death, and must, on request, provide a defendant charged in a death with a copy of the autopsy report. G. L. c. 38, § 7. We conclude that given these considerations, a defendant should show cause and specific need in a motion for access to a victim's body. Here, the defendant's written motion on its face did not articulate a specific need for the second autopsy. At the hearing, on questioning from the judge, Woodward did not claim that there was anything wrong with the autopsy performed by the medical examiner.[27] She did argue that a second autopsy was needed to give her adequate time to prepare her defense and allow an expert to prepare testimony.[28] Offsetting these concerns, the judge appropriately acknowledged the interests of Matthew's family. Unlike most physical evidence, neither the courts nor the parties, without substantial reasons, may hold a homicide victim's body for a prolonged period of time. Given the lack of specificity in Woodward's articulated need for the second autopsy, it was not error for the judge to deny Woodward's autopsy request.[29]

Woodward also contends that the Commonwealth should

---

[27]To the extent that Woodward asks us to consider the Commonwealth's opposition to her motion for a second autopsy as equivalent to suppression of exculpatory evidence, her argument lacks merit. Moreover, we do not share Woodward's characterization of the Commonwealth's position at the hearing as "groundless arguments," "prejudicial conduct," and "obstructionist tactics." Our duty in reviewing a preliminary ruling such as this is not to review the Commonwealth's argument for evidence of prosecutorial misconduct, but to review whether the judge acted properly in denying Woodward's autopsy request.

[28]Woodward does not claim here that her failure to conduct a second autopsy delayed her trial preparation.

[29]In hindsight, the optimal balancing and reconciliation of each party's interests could have been accomplished by allowing Woodward's expert to be present at the autopsy, had she requested such relief. She did not. At Woodward's arraignment for assault and battery on February 6, 1997, she was informed that Matthew was in critical condition with a massive brain injury

have disclosed to her the existence of a skull fracture before Matthew's body was released for burial. Woodward's motion for an evidentiary hearing on missing tissue is silent on the skull fracture and she did not press at oral argument for relief on her contention that release of the skull for burial after completion of the autopsy constituted prejudicial loss or destruction of evidence.[30] Unlike her claim on the lost dura tissue, she did not seek preclusion of Commonwealth testimony on the skull fracture, much less the drastic remedy of exhumation that she now proposes to us. Woodward has not established her claim of prosecutorial misconduct in the Commonwealth's failure to inform her of the skull fracture until her murder arraignment hearing on February 13, 1997. There is nothing that we can detect to suggest that the Commonwealth had considered what forensic pathology evidence was critical for either the prosecution or the defense before the arraignment. In any event, we need not resolve this issue where it was not "fairly raised" below. *Commonwealth* v. *Garcia*, 409 Mass. 675, 678-679 (1991), and cases cited. These same considerations apply to her claims concerning the failure of Dr. Feigin to preserve any of the tissue evidencing hemorrhage in the scalp close to the fracture site: they were not "fairly raised" below.

Woodward also claims relief from the loss of potentially exculpatory evidence obtained during the autopsy. We focus on the "missing" sections of dura.[31] When Dr. Jan Leestma, an expert for Woodward, examined the dura, he discovered that sections of the dura were missing. The judge held a pretrial

---

and was likely to die. Woodward made no request to have a witness present at an anticipated autopsy at that time or in the next few days as hope for Matthew's survival dimmed and was extinguished. Represented by counsel, Woodward knew or should have known that an autopsy would be ordered in a death in these circumstances and that it was likely to take place expeditiously in the aftermath of death. Nor did she ask, on February 11, to have a representative present at any continuing testing by the medical examiner. We see no reason why a judge may not order an opportunity for autopsy participation by a person charged in a homicide in an appropriate case.

[30]Nor did Woodward claim before or during the trial that the release for burial of the scalp tissue constituted prejudicial loss of evidence by the Commonwealth.

[31]The dura, with the brain, was preserved after autopsy and not released to the victim's family.

hearing on this issue.[32] Dr. DeGirolami, the Commonwealth's neuropathologist, testified that he had not been informed by the medical examiner's office or anyone else of the physical evidence preservation order. Following this hearing, the judge made a finding that the tissue had been lost, but that the loss was not an act committed in bad faith in an attempt to suppress evidence. He ruled that the loss did not justify dismissal of the case because it was not "so critical to the defense as to make a criminal trial fundamentally unfair." *Commonwealth* v. *Henderson*, 411 Mass. 309, 311 (1991), quoting *Arizona* v. *Youngblood*, 488 U.S. 51, 61 (Stevens, J., concurring). We find no error in the judge's ruling.

The Commonwealth's obligation to preserve exculpatory evidence "grows out of [its] duty to disclose 'evidence favorable to an accused upon request . . . where the evidence is material either to guilt or to punishment.' " *Commonwealth* v. *Sasville*, 35 Mass. App. Ct. 15, 19 (1993), quoting *Brady* v. *Maryland*, 373 U.S. 83, 87 (1984). A defendant is entitled to relief "for the Commonwealth's failure to preserve [evidence] if [she] establishes a 'reasonable possibility, based on concrete evidence rather than a fertile imagination,' that access to the [evidence] would have produced evidence favorable to [her] cause." *Commonwealth* v. *Neal*, 392 Mass. 1, 12 (1984), quoting *State* v. *Michener*, 25 Or. App. 523, 532 (1976). We have no doubt that Woodward met the threshold showing that there was a "reasonable possibility" that the missing evidence would be favorable to her.[33]

"[W]hen potentially exculpatory evidence is lost or destroyed, a balancing test is employed to determine the appropriateness and extent of remedial action. The courts must weigh the culpability of the Commonwealth, the materiality of the evidence and the potential prejudice to the defendant. . . . Our

---

[32]Woodward also had alleged that some brain tissue was missing. After hearing, the judge concluded that Woodward had not established that brain tissue had been lost or destroyed, but rather that missing brain tissue could be attributed to natural deterioration over time and from ordinary handling. Woodward does not challenge that finding.

[33]For example, Dr. Leestma testified that the missing left side section of the dura was of "minimal" importance for purposes of his analysis, but that the right side section was "the bullseye of the medical problem that was going on." Dr. Leestma further testified that the slide from the right side section of the dura, provided by the Commonwealth from Dr. DeGirolami's work, was prepared in a way that was difficult to interpret.

test does not require the Commonwealth to prove good faith or earnest efforts to preserve the evidence." *Commonwealth* v. *Olszewski*, 401 Mass. 749, 755 (1988), *S.C.*, 416 Mass. 707 (1993), cert. denied, 513 U.S. 835 (1994), quoting *Commonwealth* v. *Willie*, 400 Mass. 427, 432 (1987). On the first prong of this test, evaluation of the Commonwealth's culpability for loss of potentially exculpatory evidence, had Dr. DeGirolami been made aware of the judicial order on evidence preservation, he could have ensured conscientious compliance to the extent feasible, in one way or another. Dr. DeGirolami is not at fault for any loss. But the failure to communicate to Dr. DeGirolami the importance of preserving tissue obtained from the body, in light of the very specific court order,[34] is a failure of duty amounting to negligence by the medical examiner.

We recognize that the prosecutor's responsibility for the negligence of the medical examiner's office is more attenuated than its responsibility for loss or suppression of evidence by law enforcement personnel.[35] "Ordinarily the prosecutor's obligation to disclose information is limited to that in the possession of the prosecutor or police." *Commonwealth* v. *Donahue*, 396 Mass. 590, 596 (1986), quoting *Commonwealth* v. *Liebman*, 379 Mass. 671, 675 (1980), *S.C.*, 388 Mass. 483 (1983). But "[t]he prosecuting attorney's obligations . . . extend to material and information in the possession or control of members of his staff and of any others who have participated in the investigation or evaluation of the case and who either regularly report or with reference to the particular case have reported to his office." *Commonwealth* v. *St. Germain*, 381 Mass. 256, 261-262 n.8 (1980), quoting ABA Standards for Criminal Justice, Standards Relating to Discovery and Procedure Before Trial 2.1(d) (Approved Draft 1970). The medical examiner is such a person. The Legislature contemplated coordination of efforts between the medical examiner and the district attorney in investigation of deaths where criminal violence appears to have taken place. See G. L. c. 38, §§ 1, 4, 5. Particularly in light of the court order, the medical examiner, a Commonwealth agent, was accountable for preserving the dura tissue samples.

---

[34]At the pretrial hearing on the missing tissue, the chief medical examiner, Dr. Richard Evans, admitted that he had been made aware of the court order.

[35]We agree with the judge that there was no evidence of bad faith by the Commonwealth.

On the second prong of the test — materiality of the lost evidence — we conclude that the missing right side section of dura was material to Woodward's theory of the cause of Matthew's death. As for the third prong of the test — the prejudice to the defendant from the loss of evidence — we are not persuaded that the degree of prejudice is so great as to warrant dismissal of the indictment. The jury heard an abundance of evidentiary detail on, and medical opinion endorsing, Woodward's theory from Dr. Leestma, based on his examination of sections of dura covering areas other than that over the fatal hematoma. The jury also heard from Woodward's other expert medical witnesses, relying on a significant amount of other medical and autopsy data, who gave opinions endorsing Woodward's theory of the cause of death. The lost right side section of dura was an important piece of potentially exculpatory evidence, but may well have been cumulative of other forensic evidence marshaled by Woodward's experts. The loss of evidence in this case was not so overwhelmingly prejudicial as in other cases in which lost evidence was uniquely critical. See, e.g., *Commonwealth* v. *Henderson, supra* at 311 (police officer's writing of victim's description of assailant lost); *Commonwealth* v. *Olszewski, supra* at 752-753 (numerous items lost from crime scene, victim's autopsy, and victim's vehicle); *Commonwealth* v. *Gliniewicz,* 398 Mass. 744, 748 (1986) (pieces of boots, showing minute traces of blood linking defendant to murder, destroyed during serological testing); *Commonwealth* v. *Sasville, supra* at 18, 29 (fetal tissue from rape complainant's abortion, available for genetic marker testing as evidence of identity of rapist, destroyed at Commonwealth's direction). Of these cases, we affirmed dismissal of an indictment in *Henderson, supra* at 310. The Appeals Court in *Sasville,* ruling that the culpability of the Commonwealth "amounted to a rare case of gross negligence and, in fact, comes perilously close to supporting an inference of bad faith," reversed the judgment below and ordered the indictment dismissed. *Sasville, supra* at 24, 29. In *Olszewski, supra* at 750, and in *Gliniewicz, supra* at 745, we did not order dismissal of the indictments, but remanded for new trials. Neither the Commonwealth's culpability nor the prejudice to the defendant is as great here as in those cases.

We agree with the judge that the loss of the dura evidence did not justify dismissal of the indictment against Woodward. "Absent egregious misconduct or at least a serious threat of

prejudice, the remedy of dismissal infringes too severely on the public interest in bringing guilty persons to justice." *Commonwealth* v. *Cinelli*, 389 Mass. 197, 210, cert. denied, 464 U.S. 860 (1983). In light of Woodward's request that we not remand for retrial, we need not reach the question whether the judge's failure to exclude testimony presented by the Commonwealth relevant to the missing dura tissue would be ground for reversing the manslaughter conviction and remanding for retrial. For similar reasons we conclude that the medical examiner's negligence in failing to produce in a timely way the two closer, more sharply focused photographs of the skull fracture and the prejudice from their belated availability to Woodward were not so great as to justify dismissing the indictment. In response to the admittedly belated delivery of the photographs to Woodward, she requested only that she be allowed to recall two of her experts, relief that the judge granted in part.[36] Her expert testified that the photographs provided important confirming evidence that the skull fracture was weeks old. In his ruling on Woodward's posttrial motion, the judge noted that this testimony was "the last word on the photographs and the conclusions to be drawn from them," and correctly determined that Woodward had not been prejudiced by the late disclosure.

2. *Conclusiveness of scientific evidence on healing.* Woodward also asks that we reverse her conviction and remand for a required finding of not guilty. We consider this request in two ways: as a request for review of the judge's denial of her motion for a required finding of not guilty and, as Woodward urged in oral argument, a claim that her expert's testimony at trial — evidence of healing processes[37] — unrebutted by the Commonwealth, conclusively establishes that Matthew's fatal

[36]Contrary to Woodward's argument, the judge's decision to allow only one expert witness of Woodward's choice to return to the stand and testify on the photographs was not prejudicial. It is within the judge's discretion to limit potentially cumulative testimony on the same matter. See *Commonwealth* v. *Durning*, 406 Mass. 485, 495 (1990).

[37]Dr. Leestma, a leading forensic neuropathologist and the author of an authoritative text on forensic neuropathology, produced magnified microscopic photographic images of a specimen from the epidural surface of the dura, that side of the dura facing the interior of the skull, and testified to detecting "osteoblast" cells in the periosteum taken from a sample of the dura that he concluded came from the site of the fracture. He testified that these were signs of healing that marked the age of the skull fracture as "weeks" old.

injury occurred weeks before the day of his hospitalization and precludes a guilty verdict.

Our standard of review on motions for a required finding of not guilty is, considering the evidence in the light most favorable to the Commonwealth, "whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Commonwealth* v. *Cordle*, 412 Mass. 172, 175 (1992). As the judge pointed out, to reach a guilty verdict the jury had to conclude that the Commonwealth had proved its case beyond a reasonable doubt and, considering Woodward's defense, "spurned as not worthy of belief, professional opinions emanating from a corps of highly-qualified, authoritative experts, [but] such dismissal is unquestionably within the jury's province." The Commonwealth presented its own qualified experts, including many of the treating physicians, who concluded that Matthew's fatal injury was caused on the day of his hospitalization. The Commonwealth also effectively cross-examined Woodward's medical experts. Viewing this evidence, as we must, in the light most favorable to the Commonwealth, the judge did not err in denying Woodward's motion. See *Cordle, supra*; *Commonwealth* v. *Latimore*, 378 Mass. 671, 676-679 (1979), *S.C.*, 423 Mass. 129 (1996).

Woodward also presses us to take judicial notice of the validity of and conclusive proof inferred from Dr. Leestma's "crucial finding of periosteum dislodged from the fracture in the dura." This finding "alone," she argues, "proved" that the skull fracture was weeks old.[38] Woodward did not ask the judge to take judicial notice of this "conclusive" scientific evidence. She did, however, argue that the judge consider this issue as grounds for her postverdict motion for a required finding of not guilty. Because the claim for judicial notice was not seasonably raised below, we need not reach it here. We decline, in any event, either on review of the judge's denial of a required finding of not guilty, or based on taking judicial notice ourselves of scientific evidence of the age of Matthew's head injury,[39] to set aside Woodward's conviction. She cites us no other similar case

---

[38]Because both prosecution and defense experts agreed that the fatal subdural hematoma and the fractured skull were caused by the same event, proof that the skull fracture was weeks old is, Woodward argues, an "outcome-determinative issue."

[39]Woodward relies here all but exclusively on the testimony of Dr. Leestma who produced the magnified microscopic photographic images of specimens

in which a lower court judge, much less an appellate court, has so credited such evidence.

### III. THE SENTENCE

Because we decline to grant the principal relief requested by the Commonwealth — reinstatement of the jury verdict — we consider the Commonwealth's request that we set aside the sentence imposed, and resentence Woodward ourselves or remand the case to the Superior Court for resentencing by another judge. The Commonwealth seeks to avail itself of these remedies under G. L. c. 211, § 3, our general superintendence power. The relief requested has no precedent. It is settled law that the task of imposing the sentence on a defendant convicted of a crime rests with a judge in the trial court. It is not our role to enter an order modifying or adjusting a sentence. If a sentence is unlawful, we set aside the imposed sentence and remand the case to the trial judge for appropriate resentencing. See *Commonwealth* v. *Coleman*, 390 Mass. 797, 804 (1984); *Commonwealth* v. *Franks*, 365 Mass. 74, 81-82 (1974). The Commonwealth, in its request for one form of alternative relief — that we take it upon ourselves to resentence Woodward — provides no reason why we should depart from this well-settled principle.

As a second form of alternative relief, the Commonwealth asks that we remand the case for resentencing of Woodward by another judge in the Superior Court. That relief is also not available to the Commonwealth for multiple reasons that the dissent ignores. To begin with, our review of criminal sentences is limited. "We recognize that it is not within the power of this court to review an otherwise lawful sentence. This authority is delegated to the Appellate Division of the Superior Court . . . ." *Commonwealth* v. *Coleman, supra.* See *Commonwealth* v. *Franks, supra* at 81 (lawful sentence is one "which is within the limits of the applicable statutory provisions").

---

of the dura. His testimony on cross-examination is not entirely clear, although one interpretation could be that he did not know the precise location from which he had taken the critical dura samples and that the bone material he observed (excluding "vital reaction") could have been an artifact of the autopsy and therefore come from a location other than from the site of the skull fracture. This ambiguity is sufficient in itself for us to reject Woodward's request that we give conclusive weight to Dr. Leestma's findings.

Our review of a defendant's sentence at the request of the Commonwealth is exceedingly rare.[40] We have allowed such appeals and remanded for resentencing *only* in the procedural circumstances when a judge has granted a defendant's post-sentencing motion, pursuant to Mass. R. Crim. P. 29, 378 Mass. 899 (1979), to revise or revoke a sentence originally imposed, and the Commonwealth has sought reimposition of the original sentence. See *Commonwealth* v. *Barclay*, 424 Mass. 377, 379-380 (1997); *Commonwealth* v. *Cowan*, 422 Mass. 546, 547 (1996); *Commonwealth* v. *Amirault*, 415 Mass. 112, 115 (1993).[41] We have found statutory authority for Commonwealth appeals in that line of cases by broadening our construction of G. L. c. 278, § 28E (appeals by Commonwealth). *Amirault, supra* at 113-115. That statute, section 28E, until amended by St. 1979, c. 344, § 45, and construed in *Commonwealth* v. *Therrien*, 383 Mass. 529, 534 (1981) (upholding Commonwealth's right to appeal from a postverdict finding of not guilty pursuant to Mass. R. Crim. P. 25 [b] [1], 378 Mass. 896 [1979]), and in *Commonwealth* v. *Gaulden*, 383 Mass. 543, 550 (1981) (upholding Commonwealth's right to appeal from verdict reduction pursuant to rule 25 [b] [2]), had been interpreted to authorize the Commonwealth's appeals only from pretrial motions. See *Commonwealth* v. *McCarthy*, 375 Mass. 409, 413 (1978). In *Therrien, supra* at 535, we sounded a note of caution that double jeopardy principles require that the allowance of certain post-

[40]More frequently, but still only in rare circumstances, have we reviewed sentences when a defendant on appeal claims that the sentence is unlawful, a question that we have interpreted narrowly. Our review has been limited to the constitutionality of a sentence, see, e.g., *Commonwealth* v. *Therriault*, 401 Mass. 237, 240 (1987); *Commonwealth* v. *Jackson*, 369 Mass. 904, 910-913 (1976); sentences imposed for crimes of which the defendant was not convicted, see, e.g., *Commonwealth* v. *Goodwin*, 414 Mass. 88, 93 (1993); *Commonwealth* v. *LeBlanc*, 370 Mass. 217, 223-225 (1976); and increased sentences following retrial wherein a judge failed to articulate reasons to overcome a presumption of vindictiveness against the defendant for successfully exercising his right to appeal error in a first trial, see, e.g., *Commonwealth* v. *Hyatt*, 419 Mass. 815, 819-820 (1995). We have never reviewed a sentence, even at the request of a defendant, where the claim rests on some alleged legal error at trial, to say nothing of a sentence "tainted by legal error." *Post* at 694.

[41]The difference in the procedural circumstances of those cases and this one is critical: those defendants had initiated review in the trial court of the originally imposed sentences, and the Commonwealth's appeals arose only in response to the defendants' success in gaining reduced sentences. In this case, review of the sentence has not been initiated by Woodward.

trial defense motions "must be treated as terminating the criminal prosecution without any right to appeal." General Laws c. 278, § 28E, of course, provides no basis on which the Commonwealth can appeal from a sentence that has not been revised or revoked at the request of a defendant, and there is no rule of criminal procedure that permits the Commonwealth to take such an appeal.

We may not vacate a sentence such as we have here, that was within statutory limits, because it appears too lenient or too harsh.[42] We do not vacate a sentence unless we have been able to identify clear legal error in the sentence, and certainly not because of a "sense of unease that permeated the proceedings." *Post* at 691. When asked to remand cases to increase defendants' sentences, our jurisprudence confines us to cases of clear and identifiable error in the sentence itself, for the most substantial reason — our fundamental common-law traditions and constitutional principles of double jeopardy.

Under the common law, as recognized by our cases for more than one century, a trial judge, and a trial judge only, could increase a defendant's sentence if, and only if, "no action had been taken under the original sentences, such as delivering [the defendants] to the house of correction to commence their terms," in other words, "so long as it remained unexecuted . . . ." *District Attorney for the N. Dist.* v. *Superior Court*, 342 Mass. 119, 121, 123 (1961) (clarifying common-law rule to allow *reduction* of a defendant's sentence after execution), relying on *Commonwealth* v. *Weymouth*, 2 Allen 144, 147 (1861).[43] A common-law rule is not absolute, and this rule has been

---

[42]We have observed that a judge "has considerable latitude within the framework of the applicable statute to determine the appropriate individualized sentence." *Commonwealth* v. *Goodwin*, 414 Mass. 88, 92 (1993).

[43]In *Commonwealth* v. *Weymouth*, 2 Allen 144, 147 (1861), we said, "Until something was done to carry the sentence into execution, by subjecting the prisoner to the warrant in the hands of the officer, no right or privilege to which he was entitled was taken away or invaded, by revoking the sentence first pronounced, and substituting in its stead the one under which he now stands charged." See *Commonwealth* v. *Foster*, 122 Mass. 317, 323 (1877). Later, we acknowledged that "from early times the importance of the fact that a sentence has not been executed in whole or in part has been recognized in cases where the power of the court to amend or set aside and impose a new sentence has been involved." *Fine* v. *Commonwealth*, 312 Mass. 252, 256 (1942).

qualified by statutory developments.[44] See *Commonwealth* v. *Therrien*, 383 Mass. 529, 532 (1981); *Fine* v. *Commonwealth*, 312 Mass. 252, 255-256 (1942). It nonetheless has been important in constitutional interpretation of double jeopardy principles.[45]

In Federal criminal cases, constitutional double jeopardy principles limit the prosecution's right to appeal sentences to those cases explicitly authorized by statute; such statutes limit the scope of and narrowly focus such prosecution appeals. *United States* v. *DiFrancesco*, 449 U.S. 117, 136 (1980); *United States* v. *Scott*, 437 U.S. 82, 84-85 (1978). States risk offending the double jeopardy clause of the Fifth Amendment to the United States Constitution, made applicable to the States through the Fourteenth Amendment to the United States Constitution, see *Benton* v. *Maryland*, 395 U.S. 784, 795-796 (1969), if State appellate courts, absent explicit and properly limited statutory authority, review otherwise lawful sentences appealed by prosecutors. See *Pennsylvania* v. *Goldhammer*, 474

---

[44]See, e.g., G. L. c. 278, §§ 28A-28C, allowing, on a *defendant's* appeal, amendment of judgment and resentencing, including an increase in sentence. See *Walsh* v. *Commonwealth*, 358 Mass. 193, 198 (1970) (sentence increase not double jeopardy because "[i]t is only at a defendant's request that the Appellate Division acts"); *Hicks* v. *Commonwealth*, 345 Mass. 89, 91 (1962), cert. denied, 374 Mass. 839 (1963) (no need to consider common-law limitations on revision of sentences by the trial judge once sentence has been imposed, because Legislature has power to grant Appellate Division continuing jurisdiction to revise a sentence on an appeal *initiated by a defendant*).

[45]See *United States* v. *Benz*, 282 U.S. 304, 307 (1931) ("The distinction that the court during the same term may amend a sentence so as to mitigate the punishment, but not so as to increase it, is . . . based . . . upon the ground that to increase the penalty is to subject the defendant to double punishment for the same offense in violation of the Fifth Amendment to the United States Constitution, which provides that no person shall 'be subject for the same offense to be twice put in jeopardy of life or limb' "). See also *United States* v. *DiFrancesco*, 449 U.S. 117, 134 (1980) ("our Double Jeopardy Clause was drafted with the common-law protections in mind. . . . This accounts for the established practice in the federal courts that the sentencing judge may recall the defendant and increase his sentence, at least [and we venture no comment on this limitation] so long as he has not yet begun to serve that sentence"), citing *United States* v. *Wilson*, 420 U.S. 332, 340-342 (1975); *Green* v. *United States*, 355 U.S. 184, 200-201 (1957) (Frankfurter, J., dissenting); *Ralston* v. *Robinson*, 454 U.S. 201, 224 (1981) (Stevens, J., dissenting) ("Whether the well-settled rule prohibiting judges from increasing the severity of a sentence after it has become final is constitutionally mandated, it is unquestionably the sort of rule that judges may not disregard without express authorization from Congress").

U.S. 28, 30-31 (1985); *DiFrancesco, supra* at 138-139. "It is clear from *DiFrancesco* and *Goldhammer* that when a sentence is increased in a second proceeding 'the application of the double jeopardy clause . . . turns on the extent and legitimacy of a defendant's expectation of finality in that sentence. If a defendant has a legitimate expectation of finality, then an increase in that sentence is prohibited . . . .' " *Jones* v. *Thomas,* 491 U.S. 376, 394 (1989) (Scalia, J., dissenting), quoting *United States* v. *Fogel,* 829 F.2d 77, 87 (D.C. Cir. 1987). *DiFrancesco, supra,* makes clear that the "extent" of a defendant's expectation of finality is limited only when a statute specifically authorizes prosecution appeals of sentences. Our authority under G. L. c. 211, § 3, contains no explicit statutory authority to review sentences at the request of the Commonwealth, and no other statute otherwise authorizes review in these circumstances.

The "legitimacy" of a defendant's expectation of finality in a sentence is, of course, undercut when a sentence is unlawful. Contrary to the dissent's characterization, the Commonwealth makes no claim that the sentence imposed on Woodward is unlawful. The Commonwealth concedes that the sentence imposed falls within the broad range of punishment established by statute for a manslaughter conviction. See G. L. c. 265, § 13. Pressed several times at oral argument, the Commonwealth refused, perhaps out of respect for our jurisprudence on sentencing, to argue for consideration of the lawfulness of the sentence on any ground independent from its claim of error on the judge's postverdict reduction of Woodward's crime to manslaughter. In the procedural posture of this appeal, the only legitimate way to arrive at an increase in Woodward's sentence is to conclude that error prejudicially infected the judge's decision to reduce the verdict, reinstate the original conviction of murder in the second degree, and remand the case to the Superior Court for imposition of the statutorily mandated sentence.[46] But, the dissent finds no error in the judge's postverdict reduction of Woodward's crime to manslaughter.

---

[46]Double jeopardy principles do not bar an appeal by the Commonwealth of a reduction in verdict pursuant to rule 25 (b) (2). See *Commonwealth* v. *Gaulden,* 383 Mass. 543, 550 (1981). See also *Commonwealth* v. *Therrien,* 383 Mass. 529, 531 (1981). There is, of course, another way that Woodward's sentence could be increased — if a second trial were held. Had we ordered a new trial, Woodward could have received a more severe sentence on a second conviction, see *North Carolina* v. *Pearce,* 395 U.S. 711, 721-722 (1969), although we have limited the basis on which a defendant may receive an increased sentence on retrial. See *Commonwealth* v. *Hyatt,* 419 Mass. 815,

The dissent suggests that the sentence should be reconsidered because it is "tainted by legal error." *Post* at 694. Remanding on such a basis to increase a sentence would mark a dramatic departure from our case law and the constitutional principles relevant to increasing sentences on the Commonwealth's appeal. We have never vacated a sentence for the procedural "taints" identified by the dissent: an expedited sentencing hearing and the possible resulting unavailability of the victim's family to provide a *second* set of victim impact statements, time constraints on yet further prosecution argument, or the failure of the record to reflect factors and sentencing goals considered by the judge in deciding Woodward's sentence. Sentencing proceedings not infrequently have some or all of these features, as the dissent recognizes. *Post* at 692 n.2. Here, the Commonwealth acceded to the hearing as scheduled, as the dissent also recognizes, did not ask for a continuance for its own sake or in order for Matthew's family to be in attendance,[47] and articulated sufficient reasons for the sentence that it recommended. The Commonwealth's time to prepare for argument on sentencing was not limited to the hours between the morning release of the judge's order reducing the verdict and the sentencing hearing scheduled for that afternoon. It had ample opportunity to prepare during the six-day interim between the hearing on the posttrial motion and the release of the judge's order, when the only remaining matter to be addressed was resentencing, in the event that the Commonwealth lost on Woodward's posttrial motion. Nor can one conclude from the expedited sentencing hearing that the judge had failed to deliber-

819-822 (1995) (requiring that judge articulate reasons for an increased sentence on retrial, based on information not before the first sentencing judge). Woodward, given our resolution of the Commonwealth's appeal, does not seek a new trial. Were we to increase her sentence, as advocated by the dissent, we would also have to reach the merits of Woodward's other claimed errors. One or more of these claimed errors may have required a retrial, an outcome that, it appears, neither the Commonwealth nor the dissenting Justices believe would be in the interest of any party or the public.

[47]The dissent makes much of a potential violation of rights of Matthew's family, citing G. L. c. 258B, § 3. The point was never argued by the Commonwealth. In any event, our reading of the exchange on this point between the judge and the prosecutor indicates that the judge was open to receiving at that time or later any additional statements that the Eappens may have wanted to submit, and that the prosecutor was fully empowered to represent, as he did, the Eappens' willingness to rely on their earlier victim impact statements for purposes of Woodward's resentencing.

ate fully his sentencing decision in light of the abundant information available to him concerning the defendant and the victim's family before and during the course of this most amply explored case. We also do not draw any adverse conclusion from the sparseness of the record of the sentencing decision: we do not require a judge to give reasons for a sentence. See *Commonwealth* v. *Banker*, 21 Mass. App. Ct. 976, 979 (1986). None of the alleged flaws in the sentencing proceeding vitiates the sentence singly. Only by the addition of something ineffable to the sum of these alleged flaws does the dissent suggest impropriety of the sentence, but that ineffable something is not identified.

The dissent also intimates that, because Woodward asked that the jury not receive a manslaughter instruction, the sentence for manslaughter imposed by the judge is inappropriate. We do not limit a judge's postverdict discretion to correct injustice because it may have been brought about due to a defendant's trial strategy, unsuccessful in hindsight. See, e.g., *Commonwealth* v. *Millyan*, 399 Mass. 171, 188-189 (1987) (failure of defendant to request intoxication instruction because it was inconsistent with trial strategy did not preclude verdict reduction, in light of evidence of intoxication); *Commonwealth* v. *Franks*, 365 Mass. 74, 82 (1974) (failure of defendant to except to judge's charge to jury does not preclude court from vacating sentence imposed for crime not committed).

Finally, we have criticized the judge for his error in acceding to Woodward's request not to give a manslaughter instruction. His ruling did have a basis in our cases, for we have declined to penalize defendants who adopt an "all-or-nothing" strategy.[48] His ruling does not suggest, nor does the dissent imply, that the judge committed a legal error purposefully to favor Woodward. There is no complaint about his day-to-day handling of this lengthy and complex trial.

The Commonwealth's only argument that conceivably could be interpreted as grounds for revisiting Woodward's sentence is that, in reducing Woodward's verdict and sentence, the judge must have found that Woodward had committed "no crime," and that the judge "converted" her conviction of murder to an "acquittal." That interpretation of the judge's actions is not convincing. We have noted that the judge on a rule 25 (b) (2)

---

[48]See note 6, *supra*, for discussion of *Commonwealth* v. *Jackson*, 419 Mass. 716, 725 n.8 (1995); *Commonwealth* v. *Roberts*, 407 Mass. 731, 737 (1990); *Commonwealth* v. *Pagan*, 35 Mass. App. Ct. 788, 791-792 (1994).

motion need not draw the same conclusions from the evidence as did the jury. See *Commonwealth* v. *Keough*, 385 Mass. 314, 319-320 (1982); *Commonwealth* v. *Gaulden*, 383 Mass. 543, 555 (1981). But this judge, in reducing this jury's verdict to manslaughter, must have accepted the jury's finding that Woodward's actions caused Matthew Eappen's death; he had the option to, but did not, order the entry of a finding of not guilty. Mass. R. Crim. P. 25 (b) (2). Having had the opportunity to view all the witnesses face-to-face, including Woodward who testified, he concluded that Woodward was guilty of a most serious crime — for manslaughter is such a crime. We do not view the judgment against Woodward as a light matter. She stands guilty of causing an infant's violent death. The outcome of this criminal trial most assuredly was not an "acquittal."

The dissent claims that this case is exceptional. It is not. Judges do reduce jury verdicts to some lesser degree of crime. The law permits them to do so. Judges regularly sentence defendants to time served. The law permits them to do it. What would be exceptional is the disposition urged by the dissent. Whatever the scope of our powers, it does not allow us to act on the basis of impressions and characterizations that have no correlate in acknowledged rules or doctrines. It is the essence of the rule of law that exceptions that burden defendants not be made unless justified by some rule or principle that we would be willing to follow in other cases.

Because the sentence imposed by the judge is lawful, we decline to remand the case for consideration of an increase in the defendant's sentence. The conviction of manslaughter, together with the sentence imposed, shall stand. The Commonwealth's petition for G. L. c. 211, § 3, relief and the defendant's motion to dismiss the Commonwealth's petition are remanded to the county court for entry of an order denying the relief sought by each. The actions of the Superior Court judge in reducing the conviction of the defendant and sentencing her to the time deemed served are affirmed.

*So ordered.*

GREANEY, J. (dissenting in part, with whom Abrams and Ireland, JJ., join). I conclude that we should vacate the sentence imposed and have Woodward resentenced by another Superior

Court judge. This case presents circumstances unique to our rule 25 (b) (2) jurisprudence. Mass. R. Crim. P. 25 (b) (2), 378 Mass. 896 (1979). In no other case has the trial judge denied a request by the Commonwealth for an obviously necessary lesser included offense instruction at the request of the defendant, and subsequently reduced a verdict returned by the jury on the greater offense to the lesser offense which the jury had been precluded from considering. The court correctly points out that the judge's failure to instruct on manslaughter was error. The judge improperly acquiesced in Woodward's counseled position that such an instruction should not be given, and he did so in reliance on case law that did not support that position.[1] This error created the basis for the judge's subsequent reduction of Woodward's conviction to manslaughter.

What further sets this case apart from most, if not all, others is that this chain of events was set in motion by Woodward, who, after examination in open court, and with the assistance and advice of her lawyers, knowingly and voluntarily agreed to the choices that would be given to the jury. Woodward pressed for those choices despite having full knowledge that her strategic decision might be rejected by the jury. Woodward's tactics, with the judge's approbation, transformed the trial from a search for the truth to a high stakes game of chance. In a phrase, Woodward brought the result on herself. There is much force in the Commonwealth's argument that the judge's actions appear "to have manipulated the trial's outcome and marginalized the jury, all to Woodward's benefit." *Ante* at 672. To their credit, the jury steeled themselves to their duty and returned a verdict finding Woodward guilty of the unlawful and intentional killing of an eight month old child.

The judge's error created a deep structural flaw in the trial, resulting in a sense of unease that permeated the proceedings that followed, and which was exacerbated by the nature of the sentencing proceedings following the verdict reduction. It is this singular series of events from which the Commonwealth's concerns about the propriety of Woodward's sentence arise.

As the court states, *ante* at 687, the Commonwealth concedes that the sentence imposed falls within the range of punishment prescribed in G. L. c. 265, § 13, for a manslaughter conviction.

---

[1]Woodward's additional argument that a manslaughter instruction would have been prejudicial because it might have invited a compromise verdict is frivolous.

Contrary to the court's reading of the record, however, the Commonwealth indeed argues that the sentence imposed on Woodward is nonetheless unlawful, basing its claim on the sentence being "inextricably intertwined" with the judge's "unlawful reduction in verdict." While the court concludes that, despite the instruction error, the judge acted within his discretion on Woodward's rule 25 (b) (2) motion in reducing the verdict to manslaughter, there are significant concerns raised by the sentencing procedures employed in this case, and by the particular sentence imposed, that the sentence should be considered independently from the verdict reduction. The Commonwealth also urges our review of the sentence pursuant to our authority under G. L. c. 211, § 3, "to set aside a sentence imposed contrary to law." See *Commonwealth* v. *Cowan*, 422 Mass. 546, 547 (1996) (affirming single justice of this court who vacated an improper sentence, stating "[i]t is well within this court's general superintendence power to correct a sentence that has been imposed contrary to law"). Thus, the legality of Woodward's sentence was adequately raised by the Commonwealth, and the concerns now addressed are inherent in its request that this court review the sentence.

In view of the procedural posture of this case — the uniqueness of which the judge was well aware — I am particularly troubled by the dispatch with which the judge scheduled the sentencing hearing on the same afternoon that he released his postverdict order reducing Woodward's conviction, and by the cursory hearing that he then conducted, which was followed almost immediately by the time-served sentence.

My review of the transcript of the sentencing hearing suggests that the Commonwealth was not adequately prepared on such short notice to make a forceful argument on the appropriate sentence for Woodward's manslaughter conviction.[2] The short notice also prevented Matthew's parents from attending the hearing. While the Commonwealth noted this fact, it acceded to the judge's suggestion that he consider the victim impact statements the Eappens had made previously. These

---

[2]In his written memorandum reducing Woodward's verdict, released on the morning of November 10, 1997, the judge directed that she be brought before the court a few hours later, "then and there to receive her sentence" on the manslaughter conviction. Judges, of course, can sentence a defendant on the same day as his or her conviction, and this often occurs. However, it is assumed that judges do so with the informed consent of the parties, and after having considered all factors relevant to a proper disposition.

procedures contravene the pertinent provisions of G. L. c. 258B, § 3, that family members are entitled to be present at all court proceedings related to the offense committed against the victim, § 3 (*b*), and to be heard through an oral and written victim impact statement at sentencing about the effects of the crime on them, and as to a recommended sentence, § 3 (*p*). I question whether the statute permitted the judge to proceed so expeditiously with sentencing where the record does not reflect whether the Eappens chose not to be present at the hearing, or because he provided so little notice of the hearing (despite having said at the conclusion of the postverdict motions hearing that he would provide "ample notice" if further proceedings were required), they were effectively precluded from attending. As a result, not only might the judge's expediency have deprived the Eappens of their statutory right, but the judge did not have the benefit of their thoughts in determining Woodward's sentence on the manslaughter conviction, which may well have differed from those expressed in their earlier statements. In any event, the haste with which the sentencing hearing was conducted, followed by the hurried disposition at the conclusion of the hearing, left little time for the judge to give proper consideration to the Eappens' earlier victim impact statements.

Moreover, it is not apparent from the record of the sentencing hearing what factors and characteristics the judge considered in deciding Woodward's sentence. We have said that "[the] sentence should reflect the judge's careful assessment of several goals: punishment, deterrence, protection of the public, and rehabilitation." *Commonwealth* v. *Goodwin,* 414 Mass. 88, 92 (1993). The transcript shows, in this regard, that the judge merely stated that "[t]he same considerations that informed my decision to lower the verdict apply here," and that "[i]t is in my judgment time to bring the judicial part of this extraordinary matter to a compassionate conclusion. Taking all of the circumstances into account . . . ." These statements, combined with the cursory quality of the hearing and the haste in sentencing, suggest a rush to end the judicial proceedings and a failure to assess carefully all of the goals of sentencing in Woodward's case. In his memorandum reducing the verdict, the judge does not address the sentencing goals recognized in *Goodwin,* nor does he consider imposing on Woodward any appropriate terms of probation, despite his own conclusion that she was responsible for the death of a young child who was entrusted to her care.

In addition, the judge states in his memorandum that he "may not, however, take into account the feelings of those [who Matthew's] death has affected." While this is an appropriate statement for purposes of reducing the verdict, it nonetheless further suggests he may have failed properly to consider for purposes of sentencing the impact of Woodward's crime on Matthew's family.

The Commonwealth argues in its brief that "[t]he combination of the judge's actions created the appearance, and must have given the public the distinct impression, that the [judge] was manipulating the outcome of the trial and engineering an acquittal." We have said that, "[b]ecause the role of the sentencing court is, by nature, 'judgmental,' . . . a judge 'must maintain a stance of scrupulous impartiality and not permit [himself or herself] to become identified with the interests of either the prosecutor or the defense counsel.' " *Commonwealth* v. *Coleman*, 390 Mass. 797, 809 (1984), quoting Commentary, III ABA Standards for Criminal Justice, Sentencing Alternatives and Procedures, standard 18-6.9, at 496 (2d ed. Supp. 1982). We also have said that criminal proceedings must have "the appearance of fairness and impartiality necessary to our judicial system. '[J]ustice must satisfy the appearance of justice.' " (Footnote omitted.) *Commonwealth* v. *Howard*, 367 Mass. 569, 572 (1975), quoting *Offutt* v. *United States*, 348 U.S. 11, 14 (1954). Here, it appears that the judge identified himself with Woodward's cause, compromising the public's confidence in the integrity and impartiality of our courts.

The combination of these circumstances leads me to conclude that Woodward's sentence is tainted by legal error and thus was not lawfully imposed.[3] Accordingly, "justice [would] best be served if [Woodward were] sentenced again," *Commonwealth* v. *Franks*, 369 Mass. 608, 610 (1976), by another judge, "based solely on relevant criteria of sentencing." *Commonwealth* v. *Coleman, supra* at 810-811 n.15. A new sentencing judge, after appropriate study, reflection, and an opportunity for the parties to be heard, might impose the same period of incarceration as was imposed by the judge here, or might increase Woodward's penalty. I would recommend that a judge, in resentencing Woodward, consider imposing a suitable period of probation that makes her subject to appropriate conditions, including the following two special conditions:

---

[3]Thus, there is no need to consider the exercise of our authority pursuant to G. L. c. 211, § 3.

First, as a felon convicted of a grave act of child abuse, Woodward should not in the future be entrusted with the care of the children of others, whether for remuneration or otherwise.

Second, Woodward and her representatives or assignees should be prohibited from engaging in any activity generating any profit or financial benefit relating to the publication or dissemination by any form of media of facts or circumstances relating to her crime, her experience in the judicial system, or anything else associated with the tragic event for which she stands convicted. See *Commonwealth* v. *Power*, 420 Mass. 410 (1995), cert. denied, 516 U.S. 1042 (1996) (upholding a similar special condition of probation with respect to Katherine A. Power, a felon convicted of manslaughter, whose story drew national media attention).

These measures comprise an appropriate remedy that would rectify any harm caused by the legal error, engender confidence in the fairness and impartiality of our judicial system, maintain the dignity and integrity of our courts, and bring rightful closure to this difficult case.