COMMONWEALTH vs. WILLIAM E. BUCKLEY.

Norfolk. April 3, 1991. - May 20, 1991.

Present: LIACOS, C.J., ABRAMS, NOLAN, LYNCH, & GREANEY, JJ.

*Homicide. Robbery. Evidence*, Handwriting exemplar, Cross-examination. *Constitutional Law*, Self-incrimination, Admissions and confessions, Waiver of constitutional rights, Confrontation of witnesses. *Waiver*. *Practice, Criminal*, Preservation of evidence, Disclosure of evidence, Fair trial, Grand jury proceedings, Argument by prosecutor, Sentence. *Grand Jury.*

In a criminal case, the taking of the defendant's handwriting exemplars did not constitute a warrantless search where the defendant consented intelligently and voluntarily to giving the samples [214]; nor was there any testimonial communication involved in the taking of the exemplars that would implicate the defendant's Fifth Amendment rights [214-216]; further, the record demonstrated that the defendant had knowingly and willingly waived his Miranda rights [216] and, in any event, that he was not in custody when the samples were taken [216-218].

In a criminal case, the judge correctly concluded that the defendant was not prejudiced nor his due process rights violated by the Commonwealth's inadvertent dissolving of writing in ink on a handwritten sign in the course of testing the sign for fingerprints, where the writing had been photographed and the expert testimony at trial was based entirely on the photograph, to which the defendant had access. [218-219]

There was no merit to a criminal defendant's claim of surprise and prejudice from the judge's allowing the Commonwealth to introduce newly developed evidence that handwriting of the person upon whom the defendant had sought to place responsibility for the homicide did not match handwriting photographed on a sign found at the crime scene, where the defendant knew before trial that the photograph of the writing was to be one of the most important pieces of physical evidence at trial. [219-220]

In a murder case, the grand jury heard sufficient evidence to establish probable cause as to the defendant's involvement in the murder and any allegedly exculpatory evidence with respect to other suspects, even if presented, would not have undermined the credibility of the other evidence the grand jury heard. [220-221]

At a criminal trial in which a prosecution witness was testifying under a grant of immunity, the judge properly exercised his discretion to limit the scope of the defendant's cross-examination of the witness with respect to the supplier of the witness's cocaine (out of concern for the witness's safety) and the witness's income tax returns (as beyond the scope of the witness's immunity), where the judge permitted cross-examination of the witness in detail on his drug dealing and where the judge gave the jury special instructions on the issue of the witness's credibility. [221]

At a criminal trial the prosecutor's allegedly improper closing remarks were based on the evidence, and error, if any, was cured through the judge's instructions to the jury that closing arguments are not evidence. [221-222]

At a criminal trial there was no error in the judge's imposing consecutive life sentences upon the defendant's convictions of first degree murder based on extreme atrocity or cruelty and of armed robbery. [222-223]

INDICTMENTS found and returned in the Superior Court Department on March 18, 1988.

Pretrial motions to suppress evidence and to dismiss were heard by *Robert W. Banks*, J., and the cases were tried before him.

*Donald A. Harwood* for the defendant.

*Judith A. Cowin*, Assistant District Attorney, for the Commonwealth.

NOLAN, J. On March 18, 1988, a Norfolk County grand jury returned three indictments charging the defendant, William E. Buckley, with murder in the first degree, armed robbery, and assault with intent to rape. The trial commenced on December 5, 1988, and Buckley was found guilty on all charges. He was given a sentence of life imprisonment on the murder conviction, a consecutive life sentence on the armed robbery conviction, and a concurrent nineteen to twenty year sentence on the assault with intent to rape conviction. The defendant now appeals from his convictions and sentences. We affirm.

On the morning of December 14, 1986, the victim was found dead in the Dairy Mart convenience store in Braintree. She had been strangled and stabbed. She was naked from the

waist down. Approximately $1,800 was missing from the store's safe. On a paper bag, which was taped to the inside of the locked front door of the store, was written "will open at 7:30."

One witness testified that on December 14, 1986, at approximately 5:50 A.M., he had delivered newspapers to the Dairy Mart and exchanged greetings with the victim. Another witness, Leonard Barnes, who also regularly delivered newspapers to the Dairy Mart, testified that he arrived at the store between 6:30 and 7:00 that morning. He found the door locked and noticed the bag taped to the front door. Barnes testified that a head "popped up and popped down" inside the store. He described it as looking like a "dirty old wino." He also testified that the man he saw was wearing a red hat and that his face was either bearded or dirty. Barnes went back to his truck, and a few minutes later, he observed a red van leave the parking lot. Barnes waited a couple of minutes until another person arrived. They went into the store together and found the victim's body on the floor.

Donna Devlin, a Massachusetts State trooper, photographed the crime scene, including the paper bag which was taped to the front door. Devlin tested the paper bag for fingerprints by treating it in a solution of ninhydrin. No fingerprints were found and, in the course of testing, the writing on the bag dissolved.

Buckley was interrogated at the Braintree police station on the evening of December 14, 1986. He was the manager of 3-D Services, a business located just behind the Dairy Mart. Buckley also owned a red van. Buckley told the police that he had been at 3-D Services that morning in his red van to check on the furnace and the company vans. He stated that he went inside the building for approximately five or ten minutes and then went to a local doughnut shop to get coffee at 7 A.M. When asked where he was the prior evening, Buckley stated that he had gone to work at Hendrie's Ice Cream and that he had returned home early the next morning. He admitted to owing money to certain people but it was later determined that he did not tell the police about all of his

debts. Buckley told the police that he purchased items at the Dairy Mart several times a day. He knew the owner on a first-name basis and had a charge account at the Dairy Mart.

Later that evening, while Buckley was still being interviewed, the police called Hendrie's and were informed that Buckley was not employed there. As soon as the police learned that Buckley had lied about his job at Hendrie's, they advised him of his Miranda rights. Buckley agreed to continue talking and stated that he had been with his girl friend the prior evening. Buckley was married and had three children. He stated that he had been with his girl friend in a room they rented in Sharon until 2 A.M. and he then returned to his house where he slept on the couch so as not to disturb his wife. Buckley further stated that he had left for work in his red van at 6 A.M. and arrived at 3-D Services at 6:20.

The police officers then asked Buckley to write the words "will open at 7:30." Buckley became very nervous and asked whether he should write or print the words. He was instructed to print. After providing other writing exemplars, Buckley left the police station.

Buckley was interviewed again on December 16, 1986. He was advised of his Miranda rights at the outset of the interview. Buckley consented to a search of his red van. No evidence was recovered from the van. At the December 16 interview, Buckley provided more handwriting exemplars. At some point during the interview, Buckley requested an attorney and the interview was immediately suspended.

Gerald Dovner, owner of 3-D Services and Buckley's boss, testified that it was not part of Buckley's job to check the building on the weekends and Dovner had never asked him to check it. Dovner also testified that Buckley owed him approximately $2,300. A young woman who worked in the doughnut shop where Buckley claimed he had been at 7 A.M. testified that she remembered Buckley because his van window would not open and he had to open the door. She testified that he was there at approximately 6:15 A.M.

Edward Jerome, who owned the house in Sharon in which Buckley rented a room, testified that Buckley had asked to borrow his .22 caliber rifle to shoot some rats in the warehouse at work. Jerome testified that he saw Buckley on Sunday morning, December 14, at which time Buckley told him that he "didn't need the rifle after all."

Richard Murphy, a former employee of 3-D Services, testified that he had lent Buckley $600 to buy a boat. He also testified that Buckley sometimes wore a red stocking hat.

Frederick Brandolini, an immunized witness, testified that he had sold drugs to Buckley in 1986. Buckley owed Brandolini $1,475. Buckley paid Brandolini on the morning of December 14, 1986. Brandolini testified that Buckley appeared greasy and dirty, and paid him $560.

The victim's husband testified at trial. He testified that in November of 1986, Buckley had asked him how he found the time to look at the tapes from a video camera installed over the cash register. He told Buckley that, because the camera was "fake" he "didn't have to find time to look at the tapes." Buckley knew that the victim's husband was ill on the Wednesday before the murder and was trying to get someone to fill in for him for the weekend. Buckley had actually offered to work in his place that weekend. Buckley admitted at trial that he had seen the victim in the store on Thursday and Friday and that he knew that she was there because her husband was ill.

Handwriting samples of Buckley were admitted at trial. Three expert witnesses testified as to how Buckley's handwriting compared to the writing on the bag that had been taped to the door at the crime scene. The experts based their analysis on a photograph of the bag since the original writing was destroyed. One expert, John Swanson, testified that, in his opinion, the handwriting in the photograph matched the handwriting exemplars written by Buckley. He testified that his analysis was not affected by the fact that he was working with a photograph and not the bag itself. A second expert, Lee R. Waggoner, testified that Buckley "probably" wrote the writing on the bag in question. The third expert, Clar-

ence E. Bohn, testified that it was of the "highest probability," which meant "approaching absolute certainty," that Buckley wrote the note on the bag.

Buckley's defense at trial was that another man, George Baker, had committed the murder. Baker had also been an employee of 3-D Services at the time of the murder. Baker had been at the murder scene that morning, along with a crowd of other people. He had been wearing a maroon hat and was bearded. Baker was also interviewed by the police on the evening of December 14, 1986. During the interview, Baker stated that he had been in the Dairy Mart that morning, but the police later determined that he was confused and had actually been in the Dairy Mart on Saturday morning. Baker testified at the trial that he was not in the Dairy Mart on Sunday, December 14. During the trial, the Commonwealth obtained handwriting exemplars of Baker. Handwriting experts Swanson and Bohn examined handwriting exemplars and other writing samples obtained from George Baker. They testified that Baker's handwriting did not match the writing on the paper bag.

The defendant raises several issues on appeal. We shall discuss each of them in turn.

1. *The handwriting exemplars.* The defendant argues that the taking of samples of his handwriting by the police constituted a warrantless search in violation of art. 14 of the Massachusetts Declaration of Rights.[1] We disagree. The judge found that the defendant consented intelligently and voluntarily to giving the exemplars and the record warrants such a finding. See *Commonwealth* v. *Garcia,* 379 Mass. 422, 429-430 (1980).

Buckley also argues that the taking of the handwriting exemplars violated his right against testimonial self-incrimination under the Fifth Amendment to the United States Con-

---

[1]Article 14 states in relevant part: "Every subject has a right to be secure from all unreasonable searches, and seizures, of his person, his houses, his papers, and all his possessions. All warrants, therefore, are contrary to this right, if the cause or foundation of them be not previously supported by oath or affirmation . . . ."

stitution.[2] Specifically, he contends that, because the trooper dictated the words he wanted Buckley to write, instead of showing him the words, testimonial content was sought because the defendant's choice of spelling, capitalization, and punctuation can be discovered. We disagree. First, the taking of the Buckley handwriting exemplars did not involve a testimonial communication. Second, regardless of whether the samples were testimonial, Buckley had knowingly and intelligently waived his Miranda rights. Third, the exemplars were not obtained in a custodial situation.

The United States Supreme Court held in *Gilbert* v. *California*, 388 U.S. 263, 266 (1967), that the taking of handwriting exemplars does not violate the Fifth Amendment. The Court stated that a "mere handwriting exemplar, in contrast to the content of what is written, like the voice or body itself, is an identifying physical characteristic outside [the Fifth Amendment's] protection." *Id.* at 266-267, citing *United States* v. *Wade*, 388 U.S. 218, 222-223 (1967).

We have held that " 'testimonial' evidence, for the purpose of Fifth Amendment analysis, is evidence which reveals the subject's knowledge or thoughts concerning some fact." *Commonwealth* v. *Brennan*, 386 Mass. 772, 778 (1982). *Schmerber* v. *California*, 384 U.S. 757, 764 (1966). The defendant argues that, because he was asked to write "will open at 7:30" and was not shown the words, his subjective thought processes such as spelling were being sought. However, the words which appeared on the paper bag left at the scene of the crime were not misspelled. *United States* v. *Campbell*, 732 F.2d 1017, 1021-1022 (1st Cir. 1984) (handwriting exemplar of dictation testimonial where defendant's spelling sought; spelling distinguished from "physical habit" of handwriting). The trooper told Buckley to print the words, so choice of penmanship was also not arguably sought. As the Commonwealth has pointed out, any misspelling which

---

[2]The Fifth Amendment states in pertinent part: "No person shall be . . . compelled in any criminal case to be a witness against himself . . . ." The defendant makes no argument under art. 12, which provides that no person shall "be compelled to accuse or furnish evidence against himself."

could have appeared in the exemplars would have only been exculpatory. The words which Buckley was asked to write were common and uncomplicated. The handwriting exemplars taken were not testimonial in any way. Cf. *Commonwealth* v. *Nadworny*, 396 Mass. 342, 363-364 (1985), cert. denied, 477 U.S. 904 (1986) (asking defendant to indicate either "left" or "right" on his handwriting sample and therefore to reveal his "righthandedness" and was testimonial in nature but "trivial").

We note also that, regardless of whether the exemplars taken were testimonial in nature, there was no Fifth Amendment violation. The motion judge found that Buckley was given the Miranda warnings prior to the taking of the handwriting samples on the two occasions he provided them. The judge stated in his findings that Buckley had been given the Miranda warnings and had voluntarily, knowingly, and intelligently waived his rights in consenting to continuing questioning and giving handwriting exemplars. There is ample evidence in the record to support the judge's findings.

Finally, the defendant argues that the handwriting exemplars should be suppressed as the "fruits of [an] illegal arrest." He argues that the interviews conducted by the police were the functional equivalent of an arrest, were unsupported by probable cause, and therefore illegal. The motion judge found that the interviews of Buckley conducted at the police station were not even to be characterized as a "custodial interrogation." During the interviews of the defendant he was neither in custody nor under arrest. Therefore probable cause was not a requirement.

Whether an interrogation of a person is considered to be custodial is governed by an objective standard. *Commonwealth* v. *Tart*, 408 Mass. 249, 258 (1990). The court must look to "whether, from the point of view of the person being questioned, the interrogation took place in a coercive environment — by reference to objective indicia." *Commonwealth* v. *Bryant*, 390 Mass. 729, 736 (1984).

In *Bryant*, this court set forth several factors for determining whether an interrogation is custodial. The factors to be

considered include "(1) the place of the interrogation; (2) whether the investigation has begun to focus on the suspect, including whether there is probable cause to arrest the suspect; (3) the nature of the interrogation, including whether the interview was aggressive or, instead, informal and influenced in its contours by the suspect; and (4) whether, at the time the incriminating statement was made, the suspect was free to end the interview by leaving the locus of the interrogation or by asking the interrogator to leave, as evidenced by whether the interview terminated with the defendant's arrest." *Id.* at 737. Applying the *Bryant* factors to this case, there is no question that the judge was correct in concluding that both interviews were non-custodial. The December 14 interview occurred after the defendant voluntarily came to the police station in the company of a friend. He was asked to come at approximately 6:30 P.M. and did not actually arrive until 9:15 P.M. As the motion judge stated, Buckley was not a suspect at the time of his initial questioning and became so only upon the discovery that he had lied about his job at Hendrie's. The interview atmosphere was informal. The officers involved were in plain clothes and unarmed. Buckley left the station when the interview concluded, and this supports the position that he was free to leave.

The December 16 interview was also informally scheduled. Indeed, the police had telephoned Buckley on the evening of December 15 and asked him to come to the station. Buckley had refused, stating that he was already in bed. The police agreed that he could come the next morning at his convenience. The second interview was conducted in the same atmosphere as the first. The officers were in plain clothes and unarmed. The interview commenced with Buckley being advised of his Miranda rights, but the motion judge found that this was done "out of caution." The interview lasted only one and one-half hours, part of the time being used for a consensual search of Buckley's van. He knew that he had been free to leave the prior interview and therefore could have surmised he was free to leave the second one as well. Indeed, at some point during the course of the interview, the defend-

ant asked for a lawyer, the interview was suspended, and he left. It is clear from the nature of the interviews that they did not rise to the level of interrogation while in custody or under arrest. Therefore, probable cause was not required and the handwriting exemplars were not the fruits of an illegal arrest.

2. *Failure to preserve evidence.* The defendant also contends that the Commonwealth failed to preserve evidence, namely the writing which appeared on the bag, thus violating his due process rights. The writing on the paper bag which was found at the scene dissolved when the bag was immersed in a solution of ninhydrin for fingerprinting. The trooper who had conducted the test had photographed the sign on the door. She testified that she was not aware that when she treated the paper bag that the writing would dissolve.[3]

The judge concluded that the defendant was not prejudiced by the loss of the writing on the bag. We agree. "[W]hen potentially exculpatory evidence is lost or destroyed, a balancing test is employed to determine the appropriateness and extent of remedial action. The courts must weigh the culpability of the Commonwealth, the materiality of the evidence and the potential prejudice to the defendant." *Commonwealth* v. *Olszewski*, 401 Mass. 749, 755 (1988), quoting *Commonwealth* v. *Willie*, 400 Mass. 427, 432 (1987). We must now apply this balancing test to the facts at hand.

In this case, the Commonwealth's actions were entirely reasonable. The evidence was lost inadvertently. Indeed, the ninhydrin solution test had only occasionally discolored handwriting exemplars in the past. The trooper who tested the bag for fingerprints indicated that she had photographed the bag on the door prior to testing.

Furthermore, the failure to have the original did not prejudice the defendant. The expert testimony at trial was

---

[3]Trooper Devlin testified that she had previously treated other evidence with handwriting on it in this same solution and that, on occasion, the ninhydrin would cause a discoloration of the writing. Never before had the writing completely disappeared.

based entirely on the photograph of the bag, an item to which the defendant had access. See *Commonwealth* v. *Phoenix*, 409 Mass. 408, 413-414 (1991) (no prejudice where Commonwealth's two experts based their testimony on photograph of fingerprint before it was washed away; defendant had access to photograph and could have arranged for own expert analysis). John Swanson, one of the handwriting experts who testified at trial, stated that his analysis was not affected by the absence of the original handwriting on the bag, and that the photograph was adequate for his analysis. Clarence Bohn, another handwriting expert, testified that the fact that he had a photograph and not the bag itself had no major impact on his analysis, and the fact that four symbols were obstructed by a bar on the door of the Dairy Mart did not affect his analysis in "any way." In short, the defendant was not prejudiced by the lack of the original, and the inadvertent destruction of the writing on the paper bag did not violate his due process rights.

3. *Introduction of new evidence at trial.* The defendant further contends that the judge erred by allowing the Commonwealth to introduce newly developed evidence. Specifically, the defendant argues that the Commonwealth should not have been allowed to introduce handwriting exemplars of George Baker and elicit expert testimony to the effect that the exemplar handwriting did not match the handwriting in the photograph of the paper bag. The defendant contends that by the time that the evidence was created, his counsel had already advanced before the jury his sole defense that Baker, not he, was responsible for the homicide. The defendant claims that the timing of the development of this evidence was highly prejudicial and requires reversal of the convictions. There is no merit to this argument.

When defense counsel announced that he proposed to show that Baker, rather than Buckley, committed the crime, the prosecution followed the logical course of obtaining a handwriting exemplar for use by the experts. The defendant cannot claim to have been legitimately surprised by this, knowing as he did that the photograph of the handwritten sign

was one of the most important pieces of physical evidence available. There is no indication that the defendant was stymied in an attempt to obtain a Baker handwriting exemplar prior to trial. There was no error. Cf. *Commonwealth* v. *Donovan*, 395 Mass. 20, 23-25 (1985) (testimony of two witnesses who came forward during trial with incriminating evidence was held admissible).

4. *Failure to present exculpatory evidence to grand jury.* The defendant also contends that the indictments should have been dismissed because the prosecutor did not present evidence regarding George Baker to the grand jury. The judge denied the motion on finding that "[w]hether this evidence is exculpatory is unclear." The judge concluded that the integrity of the grand jury proceedings was not impaired by any failure of the prosecutor to present this evidence. This court will accept the findings of the judge below if they are warranted by the evidence and will give deference to the ultimate findings. *Commonwealth* v. *White*, 409 Mass. 266, 273 (1991). However, this court will make an independent determination of the correctness of the judge's application of the constitutional principles to the facts as found. *Commonwealth* v. *A Juvenile*, 389 Mass. 128, 135 (1983), and cases cited.

We note at the outset that prosecutors are not required to present all exculpatory evidence to the grand jury. *Commonwealth* v. *McGahee*, 393 Mass. 743, 746 (1985). *Commonwealth* v. *O'Dell*, 392 Mass. 445, 447 (1984). Nevertheless, when the prosecutor knows of evidence which would "greatly undermine the credibility of an important witness, the prosecutor must at least alert the grand jury to the existence of that evidence." *Commonwealth* v. *Connor*, 392 Mass. 838, 854 (1984). Here, the judge was correct in concluding that the evidence was not likely to undermine the credibility of a witness and would not likely affect the grand jury's decision to indict. At the suppression hearing, the Commonwealth denied knowledge of any exculpatory evidence. The judge correctly determined that, even if the prosecutor had mentioned other suspects or offered testimony concerning another man

who was seen wearing a maroon hat and initially stated that he was at the store that morning, this evidence would not have undermined the credibility of the other evidence heard. The grand jury heard sufficient evidence to establish probable cause with respect to Buckley's involvement in the murder. There was no error.

5. *Limitation of cross-examination.* The defendant next contends that the judge's limitation on defense counsel's cross-examination of the immunized witness, Frederick Brandolini, violated his right under the Sixth Amendment to the United States Constitution fully to confront and cross-examine the witnesses against him. On cross-examination, the judge precluded defense counsel from questioning Brandolini on whether he reported the income derived from his drug dealing on income tax returns because it was beyond the scope of Brandolini's immunity from prosecution. The judge also precluded inquiry regarding the "source" of Brandolini's cocaine, apparently out of concern for his safety. The defendant claims that these questions were pertinent to Brandolini's credibility.

Though a defendant's reasonable cross-examination of a witness is a matter of right, a judge may in his sound discretion limit the scope of cross-examination. See *Commonwealth* v. *Ahearn*, 370 Mass. 283, 286-287 (1976), and cases cited. Here, the judge's rulings were well within the bounds of his discretion. There was no error.

We note that Brandolini stated in front of the jury that he refused to answer questions regarding his income tax returns or the name of his supplier. Each time, the judge instructed the jury that they could consider Brandolini's refusal to answer the questions on the issue of Brandolini's credibility. In addition, the defendant was permitted to cross-examine Brandolini at length. He inquired into Brandolini's drug dealings in some detail. The judge did not abuse his discretion in limiting the scope of the cross-examination to this minor extent.

6. *The prosecutor's remarks during closing argument.* During her closing argument, the prosecutor stated that

Buckley had asked the jury to believe "that every witness for the Commonwealth is lying . . . or mistaken." The defendant contends that these remarks were improper and require a reversal of his convictions. We disagree. First, after making the remark, the prosecutor related it to each witness. An examination of the evidence indicates that Buckley, either through his own testimony or cross-examination, contradicted at least one aspect of each of the witnesses' testimony. Second, any error that may have occurred was repaired when the judge instructed the jury that the closing arguments of defense counsel and the prosecutor are not evidence.[4]

7. *Duplicitive sentencing.* The defendant also challenges the imposition of consecutive life sentences for the murder and armed robbery convictions. "In determining whether, on the basis of a single act, a defendant may be prosecuted and punished for two statutory or common law crimes, the long-prevailing test in this Commonwealth is whether each crime requires proof of an additional fact that the other does not. *Morey* v. *Commonwealth*, 108 Mass. 433, 434 (1871). *Kuklis* v. *Commonwealth*, 361 Mass. 302, 306-307 (1972). See *Blockburger* v. *United States*, 284 U.S. 299, 304 (1932) (adopting this test for Federal offenses). If so, neither crime is a lesser-included offense of the other, and convictions on both are deemed to have been authorized by the Legislature and hence not duplicitous." *Commonwealth* v. *Jones*, 382 Mass. 387, 393 (1981).

The judge stated explicitly that he was sentencing Buckley on the conviction of first-degree murder committed with extreme atrocity or cruelty.[5] Murder in the first degree, based

---

[4]The judge stated in his instructions: "I emphasize that the statements and arguments of counsel are not evidence. They are only intended to assist you in understanding the evidence and the contention of the parties. Any reference by the Court or counsel either in their opening or closing remarks to matters of evidence that does not coincide with your recollection of the evidence, and your equation of the evidence, it is your recollection that will control and yours only."

[5]The jury found that Buckley was guilty of murder "with extreme cruelty . . . and in the commission or attempted commission of a crime punishable by life imprisonment [armed robbery]."

on extreme atrocity or cruelty, and the crime of armed robbery each require proof of facts not essential to the other. Therefore, the imposition of consecutive sentences was not error.

We note that we have reviewed the entire record pursuant to our duties under G. L. c. 278, § 33E (1988 ed.). We find no reason to disturb the convictions or the sentences.

*Judgments affirmed.*