COMMONWEALTH *vs.* FRANK G. HARWOOD, JR.

Worcester. May 2, 2000. - August 16, 2000.

Present: MARSHALL, C.J., ABRAMS, GREANEY, IRELAND, & SPINA, JJ.

*Workers' Compensation Act,* Concurrent employment. *Practice, Criminal,* Preservation of evidence, Disclosure of evidence. *Evidence,* Failure to produce evidence, Relevancy and materiality, Exculpatory.

At a criminal trial, the judge did not err in determining that a missing file and letter were material to the defendant's case and that there was a reasonable possibility, based on concrete evidence, that the missing materials would have produced evidence favorable to the defendant's case [297-298] and that, in the circumstances, the Commonwealth was culpable for the loss [298, 302].

In a criminal case, the judge correctly determined that the appropriate remedy for the Commonwealth's negligent loss of material and possibly exculpatory evidence was the suppression of the testimony of a particular Commonwealth witness, rather than dismissal of the case. [302-303]

INDICTMENT found and returned in the Superior Court Department on February 27, 1997.

A pretrial motion for an evidentiary hearing concerning the loss of evidence was heard by *Robert H. Bohn, Jr.,* J.

An application for leave to prosecute an interlocutory appeal was allowed by *Marshall,* J., in the Supreme Judicial Court for the county of Suffolk, and the appeal was reported by her to the Appeals Court. The Supreme Judicial Court on its own initiative transferred the matter from the Appeals Court.

*Erin K. Olson,* Assistant Attorney General, for the Commonwealth.

*David L. Kelston* for the defendant.

MARSHALL, C.J. We consider whether it was an abuse of discretion for a judge to suppress the testimony of a Commonwealth witness as a remedy for a missing file containing documents that the defendant asserts were exculpatory. A key legal question is whether any mishandling of that file by the insurance fraud bureau (IFB) can be attributed to the Commonwealth.

The defendant, Frank G. Harwood, Jr., was indicted by a special grand jury on charges of insurance fraud and larceny over $250 based on evidence that he may have filed a fraudulent workers' compensation claim with ITT Hartford Insurance Company (ITT Hartford). The claim involved an injury that reportedly occurred on June 29, 1989, while he was employed by the Scola Construction Company (Scola). The Commonwealth asserts it was prepared to show that the defendant had defrauded ITT Hartford by submitting a false claim of concurrent employment at Strand's Ski Shop (Strand's) that led to ITT Hartford's paying the defendant higher workers' compensation benefits than if he had not been working at Strand's at that time.[1]

The defendant's claim of concurrent employment was allegedly supported by a document in the missing file at issue here — a February 5, 1990, letter on Strand's letterhead purportedly signed by Leif Mikkelsen (February 5 letter), a coowner of Strand's, attesting to the defendant's concurrent employment.[2] The Commonwealth asserts that the evidence indicates the signature on the lost February 5 letter was not Mikkelsen's. The defendant claims that handwriting analysis on the lost original would have nullified Mikkelsen's testimony against the defendant by establishing that, when he denied the signature on the letter was his, he lied as an immunized witness before the grand jury.

After an evidentiary hearing, the judge ruled that Mikkelsen's testimony would be suppressed. A single justice of this court allowed the Commonwealth's application for interlocutory appeal. The case was transferred to the Appeals Court, and we transferred it to this court on our own motion. We affirm.

1. *Background.* We describe the facts in some detail, based

---

[1] The Commonwealth also planned to offer evidence that after his injury the defendant falsely claimed to be working at Strand's on a part-time basis while collecting disability benefits from ITT Hartford when he had in fact returned to work at Strand's on a full-time basis. This contention plays, at most, a peripheral role in the interlocutory appeal before us.

[2] The judge found that the missing ITT Hartford claim file included the February 5 letter. The Commonwealth asserts there was no testimony or other evidence introduced at the evidentiary hearing that ITT Hartford's original claim file actually contained the original February 5 letter. Our review of the record reveals ample evidentiary basis for the judge's finding and we see no reason to disturb it. See *Commonwealth* v. *Otsuki*, 411 Mass. 218, 230 (1991), citing *Commonwealth* v. *Hine*, 393 Mass. 564, 568 (1984).

on the judge's findings and the record, to elucidate our discussion of the legal issues pertaining to the missing documents.

a. *The workers' compensation claim.* When the defendant filed his workers' compensation claim in 1989 for an injury to his ankle while working at Scola, ITT Hartford accepted the claim and began paying him temporary total disability benefits of $291.67 a week. The defendant's attorney then submitted a claim for concurrent employment benefits on his client's behalf, submitting various documents in support of the claim, including the February 5 letter, and requested that ITT Hartford increase the defendant's weekly workers' compensation payments. ITT Hartford in turn requested and obtained a completed Form 117 "Average Weekly Wage Computation Schedule" (Form 117) — purportedly prepared by Mikkelsen — that listed the defendant's weekly compensation from Strand's from April through June, 1989. On the basis of these documents, ITT Hartford increased his weekly compensation to the maximum allowed by law, $444.20 a week.[3]

Five years later, in February, 1994, the IFB received an anonymous call on its fraud hotline suggesting the defendant's claim was fraudulent. The IFB began an investigation and ultimately referred the case for prosecution to the Attorney General's insurance fraud division in December, 1995. An assistant attorney general was assigned in 1996 to investigate and prosecute the case.

The IFB also continued to investigate, interviewing Mikkelsen on several occasions. There was evidence Mikkelsen gave the IFB inconsistent statements concerning the defendant's concurrent employment. In a September, 1995, interview, Mikkelsen. reportedly confirmed the defendant's concurrent employment and wages at Strand's from April to June of 1989.[4] After sign-

---

[3]The amount of workers' compensation benefits paid a particular employee generally depends on the total wages he was earning in the period preceding the injury, including wages from employers other than the employer where the injury occurred. See G. L. c. 152, §§ 1 (1), 34, 34A, 35.

[4]In an earlier interview, however, in August, 1995, Mikkelsen reportedly told the IFB that he hired the defendant on approximately September 1, 1989, and that the defendant's injury at Scola occurred before he started at Strand's. In a third interview in October, 1995, Mikkelsen reportedly stated that only the signature on the defendant's Form 117 was his, not the writing indicating the dates worked or the defendant's wages.

ing a nonprosecution agreement with the Commonwealth,[5] however, Mikkelsen testified before a special grand jury in February, 1997, that he signed a form giving the dates of the defendant's employ at Strand's as April 22, 1989, through June 29, 1989, at a weekly pay of $405, even though the defendant was not employed there during those dates. Instead, Mikkelsen testified, the defendant had done only one day's masonry work at Strand's during that period. Mikkelsen testified that when he told the defendant the dates on the form were incorrect, the defendant responded, "That's how they want it written up," which Mikkelsen interpreted to mean that was how the defendant's lawyers wanted the pay record written up. According to Mikkelsen's grand jury testimony, he was busy, the defendant wanted the form signed, and Mikkelsen did so out of "expedience, probably shouldn't have." In his testimony, Mikkelsen denied he signed the February 5 letter, and denied he had seen the letter other than when the prosecutor showed it to him.[6] In February, 1997, the special grand jury indicted the defendant.

b. *The missing documents.* The original Form 117 from the ITT Hartford claim file is available for trial, but the original February 5 letter and the remainder of the claim file were apparently "lost." The judge found that between January, 1996, and February, 1997, the file was in the custody of an IFB investigator.[7] He found that on or about February 3, 1997, ITT Hartford asked the investigator to return the file. The principal IFB investigator for the case, Steven Combes, did not retain the original of the February 5 letter. Combes testified that shortly after returning the file, however, he went back to ITT Hartford to obtain one original document from the file, the Form 117, for handwriting analysis by the Commonwealth's expert.

[5]A February 27, 1997, letter from the Attorney General's office to Mikkelsen confirmed an agreement between them under which Mikkelsen would cooperate with the investigation of the defendant. Pursuant to the agreement, in exchange for immunity from prosecution, Mikkelsen was to furnish a complete statement to the Attorney General and to certain other law enforcement agencies or investigative bodies of the Commonwealth.

[6]Mikkelsen testified before the special grand jury that Harwood had actually worked for him from September, 1989, and after, not prior to the injury of June 29, 1989, and that the amount of money listed as paid Harwood in the February 5 letter was correct, but it had not been paid during the period from April 16, 1989, to June 27, 1989.

[7]The IFB investigator testified that he possessed the original file for about two years, returning it February 3, 1997.

In October, 1997, the defendant filed a motion for scientific tests including handwriting analyses and for production of documents, requesting production of the *originals* of the Form 117 and the February 5 letter.[8] In response, the Commonwealth agreed to provide "reasonable access to original documents at the Office of the Attorney General and under the supervision of its personnel."[9] The defendant's motion was allowed by the judge in December, 1997. The original of the February 5 letter, however, was not produced; the then prosecutor did not inform the defendant that the letter was not in her possession and she made no attempt at that time to retrieve the file from ITT Hartford. The judge later found that, at the time the motion was allowed, the file, including the original of the February 5 letter, was in ITT Hartford's Burlington, Massachusetts, office.

On April 30, 1998, June 24, 1998, and again on June 29, 1998, the defendant requested the original of the February 5 letter, again to no avail. In July, 1998, for the first time, the Commonwealth requested the original file from ITT Hartford. It was informed at that time that the file had been "lost." Finally, in August, 1998, the prosecutor informed defense counsel that the file had been lost in April or May, 1998.[10] On September 4, 1998, the defendant filed a motion for an evidentiary hearing

---

[8]Based on a copy attached to the motion, the February 5 letter stated in relevant part:

> "Frank Harwood worked for us part time in the evening re[]novating the Ski Shop as a Carpenter and a Mason."

> "He started April 16, 1989 and worked until June 27th 1989."

> "He averag[]ed $405.00/week for 10 full weeks and a partial 11th week."

[9]The assistant attorney general initially assigned in 1996 to prosecute this case was Michael Charles Cullen. Mr. Cullen left the office of the Attorney General in August, 1997, and his responsibilities for this case were assumed by Assistant Attorney General Erin Olson.

[10]ITT Hartford apparently shipped the defendant's original claim file, including the February 5 letter now at issue, to a storage facility in April or May of 1998. In its motion for reconsideration the Commonwealth asserted that, based on further investigation after the evidentiary hearing, it "appears" that the file was shipped from one ITT Hartford office to another in January, 1998. We see little in this possible difference in shipping date that would undermine the essential reasoning of the judge. Moreover, there was testimony at the evidentiary hearing by ITT Hartford's keeper of the records for the Harwood claim that the complete and full original file was in their Burlington office until April or May, 1998.

concerning "[c]ritical" evidence — the February 5 letter — that has been lost or destroyed.

On October 1, 1998, the judge allowed a motion in limine permitting the Commonwealth to use copies in place of the missing originals. The defendant's document examiners reported, however, that "[b]ased upon the quality of the photocopied signature examined, authorship of the '[Leif] Mikkelsen' signature [on the February 5 letter] *cannot be determined at this time.* An examination of the original document would establish a more conclusive opinion." (Emphasis in original.)

2. *The remedy for the missing evidence.* The general rule is that the Commonwealth has a duty to preserve exculpatory evidence for the defendant to inspect, examine, or perform tests on. *Commonwealth* v. *Neal,* 392 Mass. 1, 11-12 (1984). See *Commonwealth* v. *Woodward,* 427 Mass. 659, 678 (1998). "We have repeatedly stressed the need for prosecutors . . . to do their utmost to preserve and present 'exculpatory evidence which is available to the prosecution.' " *Commonwealth* v. *Charles,* 397 Mass. 1, 13-14 (1986), quoting *Commonwealth* v. *Redding,* 382 Mass. 154, 157 (1980). When a defendant claims he is prejudiced by missing evidence, a judge must weigh the materiality of the evidence and the potential prejudice to the defendant, as well as the culpability of the Commonwealth and its agents. See *Commonwealth* v. *Hunter,* 426 Mass. 715, 718 (1998), quoting *Commonwealth* v. *Sarourt Nom,* 426 Mass. 152, 159 (1997); *Commonwealth* v. *Olszewski,* 401 Mass. 749, 757 (1988), *S.C.,* 416 Mass. 707 (1993), cert. denied, 513 U.S. 835 (1994). Negligence and inadvertence are considered culpable for purposes of this weighing. *Commonwealth* v. *Olszewski, supra* at 757 n.7. As we shall describe, the judge applied the correct test and we "will not disturb [his] findings in such a circumstance in the absence of clear error." *Commonwealth* v. *Waters,* 420 Mass. 276, 279 (1995).

a. *Materiality and potential prejudice.* The judge concluded that the file at issue, including the original of the February 5 letter, was material to the defendant's case and there was a strong possibility that the file contained exculpatory evidence. "Evidence is material if, in considering the entire record, it creates a reasonable doubt as to the defendant's guilt that would not otherwise exist." *Commonwealth* v. *Otsuki,* 411 Mass. 218, 231 (1991), citing *Commonwealth* v. *Wilson,* 381 Mass. 90, 107

(1980). See *Commonwealth* v. *Phoenix*, 409 Mass. 408, 414 (1991). The judge reasoned that, if the signature on the letter was not a forgery, the Commonwealth's principal witness may be impeached and the defendant's case substantially advanced.

We have said that "evidence tending to impeach the credibility of a key prosecution witness is 'clearly exculpatory.' " *Commonwealth* v. *Neal, supra* at 11. It is also significant that Cullen, the Commonwealth's initial prosecutor, acknowledged at the evidentiary hearing that the February 5 letter was one of two "critical" documents in the case.

The Commonwealth argues, nonetheless, that the letter would be no more or less valuable to the Commonwealth's case if Mikkelsen had signed it because "Mikkelsen has admitted his participation in the defendant's fraudulent scheme." But the Commonwealth overstates Mikkelsen's "admission." Mikkelsen did not "unequivocally admit[]" to "participation in the defendant's efforts to defraud the insurer" as the Commonwealth asserts, but merely said that in the interests of "expedience" he signed an incomplete weekly wage statement whose dates did not seem correct to him. Moreover, any such "admission" before the grand jury was made after Mikkelsen obtained immunity from prosecution; proof by analysis of the original February 5 letter that Mikkelsen's immunized testimony was suspect or perjured would have been extremely valuable to the defendant.[11]

If Mikkelsen was not participating in a fraud scheme, then the authenticity of the signature on the letter stating that the defendant was indeed working for Strand's part-time would greatly aid his defense. There is evidence casting doubt on the credibility of Mikkelsen's later grand jury testimony concerning the letter, as the judge noted. The judge observed that "defense counsel produced . . . a letter dated April 5, 1990 from . . .

---

[11]The judge further reasoned that the February 5 letter was critical to the case because, "if the information contained in the document to the effect that the defendant was employed at Mikkelsen's business at the time indicated is not a forgery, he may have rightfully. claimed concurrent employment at the time of his injury. Conversely, if the documents are forged or are otherwise incorrect, and [the] defendant was not employed at Mikkelsen's business at the time of his injury, his claim for concurrent employment may be found to be fraudulent." The Commonwealth also asserts that Mikkelsen "admits" signing other fraudulent documents including a November 20, 1989, letter stating that the defendant was only working part-time at Strand's. Even if true, this does not vitiate the judge's ruling on the February 5 letter.

ITT Hartford addressed to Mr. Mikkelsen returning to him the February 5, 1990 letter and asking for further information relating to that letter." This April 5, 1990, letter from ITT Hartford undermines Mikkelsen's grand jury testimony that he did not see the February 5 letter until the grand jury prosecutor showed it to him.[12] In addition, there was evidence that, prior to the grand jury, Mikkelsen had made statements to the IFB consistent with the content of the February 5 letter, see note 8, *supra,* stating that Harwood had been concurrently employed at Strand's from April 22, 1989, to June 29, 1989.

The defendant's expert, in a report admitted in evidence, stated that the authorship of the signature on the February 5 letter could *not* be determined based on the photocopy examined, and the judge concluded that the defendant required the original of the letter in order to obtain a handwriting analysis. This case is thus distinguishable from *Commonwealth* v. *Buckley,* 410 Mass. 209 (1991), cited by the Commonwealth.[13] We concluded in that case that the defendant was not prejudiced by the lack of the original handwriting on a note, but there three handwriting experts involved all ventured opinions about the defendant's probable authorship of the note in question. See *id.* at 213-214, 219. We also note that the judge heard testimony from the IFB investigator at the evidentiary hearing in this case that it was preferable to have the original document for handwriting analysis, and that he had obtained one original document, the Form 117, for such analysis.

There was no error in the judge's determination that the

---

[12]Assistant Attorney General Cullen testified that he "wouldn't say that [he] was unaware of [the April 5, 1990] letter," but said that the letter did "not necessarily" make clear that Mikkelsen was lying or mistaken when he reportedly testified at the grand jury that he had not earlier seen the February 5 letter attached to the April 5 letter. In our view, however, the April 5, 1990, letter should have raised a warning flag concerning Mikkelsen's grand jury testimony about the February 5 letter and indicated the possible need to determine whether Mikkelsen had indeed signed the February 5 letter. We consequently see merit in the defendant's complaint that, "with strong reason to suspect that Mikkelsen had lied before the grand jury about the February 5 letter, the Commonwealth decided not to analyze the signature on that letter," and did not retrieve or retain the original.

[13]Three other cases cited by the Commonwealth, *Commonwealth* v. *Hunter,* 426 Mass. 715 (1998); *Commonwealth* v. *Phoenix,* 409 Mass. 408 (1991); and *Commonwealth* v. *Burns,* 43 Mass. App. Ct. 263 (1997), involving destruction of original fingerprints or analysis from photographs of lost or destroyed fingerprints, are also distinguishable.

missing file and original February 5 letter were material to the defendant's case and that there was a reasonable possibility, based on concrete evidence, that the missing materials would have produced evidence favorable to the defendant's case. See *Commonwealth* v. *Waters, supra* (findings are left undisturbed absent clear error). Moreover, because the February 5 letter, if shown to be actually signed by Mikkelsen, would have strengthened the defendant's claim of concurrent employment at Strand's and undermined Mikkelsen's later testimony to the contrary, there was potential prejudice to the defendant. Cf. *Commonwealth* v. *Hunter, supra* at 718; *Commonwealth* v. *Neal, supra* at 11. But materiality and prejudice do not end our analysis. We must also determine the culpability of the Commonwealth in the loss of the materials. See *Commonwealth* v. *Hunter, supra.*

b. *Culpability of the Commonwealth.* The prosecutor's obligations for proper handling of exculpatory evidence extend to material in the possession or control of members of the prosecutor's staff and "any others who have participated in the investigation or evaluation of the case and who either regularly report or with reference to the particular case have reported to his office." *Commonwealth* v. *Woodward,* 427 Mass. 659, 679 (1998), quoting *Commonwealth* v. *St. Germain,* 381 Mass. 256, 261-262 n.8 (1980). See *Commonwealth* v. *Martin,* 427 Mass. 816, 824 (1998) (same).

The Commonwealth does not dispute that actions taken by IFB investigators at the direction or encouragement of prosecutors are attributable to the Commonwealth, but argues only that not all actions of the IFB are imputable to the Commonwealth. The judge found that here the Commonwealth was "responsible for the inadvertent loss" of the evidence, and was culpable for its failure to preserve exculpatory evidence. The judge found the loss of the file was the result of three things: (1) the return of the file by IFB's Combes, which the judge placed under the "general umbrella" of supervision by the prosecutor, (2) the failure of the assistant attorney general to be sure that the file was preserved, and (3) the negligence on the part of ITT Hartford in misplacing the file. Implicit in this finding is the possibility of two avenues for the Commonwealth's culpability in the loss: (1) a relationship between the IFB and the Attorney General's office such that mishandling of the documents by the IFB could be attributed to the Commonwealth, or (2) failure of

the Commonwealth to take steps itself to ensure preservation of the evidence. We conclude that there was no error in the judge's determination that the Commonwealth was culpable for the loss. We examine each of these avenues in turn.

As part of his reasoning for the suppression of Mikkelsen's testimony due to the loss of the claim file, the judge noted that "given the statutory relationship . . . between the IFB and the Office of the Attorney General, that at least for purposes of preserving evidence, the IFB investigators act as an arm of the Office of the Attorney General . . . ." The Legislature statutorily authorized the creation of an insurance fraud bureau in 1990. St. 1990, c. 338, § 1 (*a*). See St. 1996, c. 427, § 13; St. 1995, c. 38, § 210; St. 1991, c. 399, § 3. See also G. L. c. 152, § 14 (requiring reporting of certain fraudulent conduct to IFB). In *Commonwealth* v. *Ellis*, 429 Mass. 362, 364-366 (1999), we described in some detail the legislative scheme for the IFB and the IFB's relationship to the Attorney General's office. We need not repeat that description except to note that the statutes governing the IFB provide for a close and coordinated relationship between the IFB and the Attorney General's office for the purposes of investigating and prosecuting insurance fraud.[14] Cf. *Commonwealth* v. *Woodward, supra* at 679 (Legislature contemplated "coordination of efforts" between district attorneys and medical examiners in certain investigations; prosecutor's obligations for handling of evidence extend to material in possession or control of medical examiner).

Moreover, it has been customary for principal investigators from the IFB to provide ongoing investigatory support for the Attorney General's subsequent inquiries. See *Commonwealth* v. *Sbordone*, 424 Mass. 802, 803, 804 & n.3 (1997); *Commonwealth* v. *Ellis, supra* at 376. Assistant Attorney General Cullen described his role as "assistance" to the IFB, testifying he "would be working with them" to bring a prosecution.[15] The statutory plan involving the IFB leaves further investigation and

---

[14]We note that, in its February 27, 1997, letter to Mikkelsen concerning the Attorney General's office's nonprosecution agreement with him, that office described "law enforcement agencies or investigative bodies of the Commonwealth . . . not limited to Insurance Fraud Bureau . . . [i]nvestigator Steven Combes," in essence including IFB investigators as part of the Commonwealth's law enforcement and investigative bodies.

[15]Mikkelsen also testified before the grand jury that for one of the interviews of him both Assistant Attorney General Cullen and IFB investigator Combes were present.

any decision to prosecute exclusively in the control of the Attorney General's office. *Commonwealth* v. *Ellis, supra* at 375. The inescapable inference is that IFB investigators were reporting information to Cullen or others from the Attorney General's office, bringing this case within the principles we enunciated in *Commonwealth* v. *Woodward, supra,* and *Commonwealth* v. *Martin, supra.* We consequently agree with the judge that, "[i]n the unique statutory scheme [that] created the IFB, that . . . agency was given certain investigatory powers that, at least for the purposes of preserving potentially exculpatory evidence, bring it under the general supervisory umbrella of the office of the prosecutor." See *Commonwealth* v. *Martin, supra.*

The IFB had the original claim file in its possession from at least January, 1996, to February, 1997. Cf. *Commonwealth* v. *Otsuki,* 411 Mass. 218, 231 (1991) (Commonwealth not culpable where neither Commonwealth nor police possessed lost bullet fragments at any time). The IFB returned the original documents at a time it should have been aware that the February 5 letter was in dispute or sought by the defendant. Although the IFB's Combes testified that when he returned the claim file to ITT Hartford on or about February 3, 1997, he told them to keep the claim file "close to hand," he also testified that he did not recall putting anything in writing to them to preserve the original file, as the IFB typically did in similar situations.[16] We agree with the judge's implicit conclusion that the IFB did not properly handle the claim file, including the original February 5 letter, and that this mishandling is attributable to the Commonwealth.

The judge also heard testimony suggesting that the Attorney General's office may not have taken all the steps it could itself have undertaken to preserve the original documents involved — a second avenue of possible Commonwealth culpability. The Commonwealth argues that it had no reason to believe the original documents were more exculpatory or material than the certified copy of the claim file that it did secure. We disagree. There was evidence indicating the Attorney General's office was aware, or should have been aware, of the importance of the original documents well before they were "lost" in April or

---

[16]Combes testified that he was working closely with Cullen concerning what the grand jury were doing and was "vaguely" aware that a subpoena was issued on January 31, 1997, from the grand jury to ITT Hartford to produce this file.

May of 1998. First, the defendant filed a motion, docketed October 29, 1997, for production of certain *original* documents, including the February 5 letter. See *Commonwealth* v. *Martin*, *supra* at 822-823. Cf. *Commonwealth* v. *Hunter*, *supra* at 718 n.1 (fact defendant did not request original evidence for over one year suggests its destruction was not in bad faith). Second, the Commonwealth solicited testimony February 27, 1997, at the grand jury from Mikkelsen asserting that his signature on the February 5 letter was forged. Thus the Commonwealth knew that the authenticity of the signature on that document was at is- sue *months before the original document disappeared*. Third, in response to the discovery motion the Commonwealth agreed to provide access to original documents at the Attorney General's office and under supervision of its personnel, certainly undercut- ting any motivation for the defendant to timely subpoena the documents from ITT Hartford.[17] Moreover, in July, 1998, the Commonwealth in fact asked ITT Hartford to return the file, something it should have done months earlier in response to the defendant's discovery request.

Mikkelsen gave several handwriting exemplars to the At- torney General's office, the first dated February 12, 1997. The exemplars were transmitted by Cullen to Barbara Harding, the Commonwealth's handwriting expert. Cullen testified that investigators examined the Form 117 and determined the handwriting did not appear to be Mikkelsen's and therefore submitted the form for examination. Cullen testified that the only document he submitted to Harding for examination was a copy of the Form 117. As for any handwriting comparisons regarding the February 5 letter, Cullen testified that Mikkelsen told investigators "that this was not his signature, and therefore there would be no comparison done on it." Paradoxically, the same reason that prompted the submission of the Form 117 for handwriting analysis — that the handwriting may not have been Mikkelsen's — was apparently the reason the signature on the February 5 letter was not submitted to Harding for analysis.

ITT Hartford's keeper of the records for the Harwood claim testified that he did not know of any instruction to ITT Hartford from the IFB, the Attorney General's office, or any other Com-

---

[17]For this reason we also view as unconvincing the Commonwealth's argu- ment against culpability that the defendant had "just as much legal access to documents in the possession of ITT Hartford as the Commonwealth did at the time he filed his discovery motions."

monwealth agency to maintain careful custody of this claim file. Cullen testified that he did not do anything to obtain particular original documents from the ITT Hartford file on the case, and did not recall whether the special investigation units department at ITT Hartford was notified to preserve the original file, as was the customary practice of the Attorney General's office. Nor did he issue any directives or admonitions to IFB investigators conveying the importance of preserving these records.[18] The judge was correct to conclude that, given the significance of the documents at issue here, these measures fell below the duty imposed on the Commonwealth to preserve the evidence.[19] See *Commonwealth* v. *Henderson*, 411 Mass. 309, 310-311 (1991).

c. *The remedy for the missing records.* Our courts have fashioned or upheld various judicial remedies for the loss of evidence, from allowing the defendant to bring to the jury's attention the Commonwealth's negligent handling of the evidence, see *Commonwealth* v. *Olszewski*, 416 Mass. 707, 716-717 (1993), to dismissal of the indictment, see *Commonwealth* v. *Henderson, supra* at 310; *Commonwealth* v. *Sasville*, 35 Mass. App. Ct. 15, 28 (1993). See also *Commonwealth* v. *Willie*, 400 Mass. 427, 432 (1987) (balancing test weighing Commonwealth's culpability, materiality of lost evidence, and prejudice to defendant is used to determine appropriateness *and* extent of remedial action). Absent a clear abuse of discretion, we will not disturb the judge's decision concerning an appropriate remedy. See *Commonwealth* v. *Henderson, supra* at 312; *Commonwealth* v. *Chase*, 42 Mass. App. Ct. 749, 759 (1997), citing *Commonwealth* v. *Perito*, 417 Mass. 674, 684 (1994).

The judge reasoned here that

> "[t]here is the possibility . . . that Mikkelsen, with whom the Commonwealth has entered into a non-prosecution agreement, was not truthful in his testimony before the Grand Jury and in his current disavowal of initiating the February 5, 1990[,] letter. Because the defendant has lost the opportunity to obtain a handwriting analysis of [this] letter and has, therefore, been deprived of the opportunity

---

[18]See note 9, *supra.*

[19]Extraordinary measures were not required of the Commonwealth to preserve this evidence and the defendant had requested the original document. Thus, a case like *Commonwealth* v. *Jewett*, 17 Mass. App. Ct. 354, 360, *S.C.*, 392 Mass. 558 (1984), cited by the Commonwealth, is inapposite.

> effectively to cross examine Mr. Mikkelsen, Mikkelsen's testimony will be suppressed."

The defendant requested dismissal of the case, which the judge declined to do, in part because the loss of the evidence was not occasioned by prosecutorial bad faith.[20] See *Commonwealth* v. *Woodward, supra* at 680-681. Compare *Commonwealth* v. *Henderson, supra* at 309-310 (indictment dismissed even though degree of police fault in loss of evidence was not great); *Commonwealth* v. *Sasville, supra* at 22, 24, 28 (dismissal of indictment should have been allowed where Commonwealth's conduct in destroying evidence came close to bad faith). We note here that the judge was specially appointed for this case and was well-versed in the details of this and related cases; his findings were exceedingly comprehensive and careful and were fully supported by the evidence. Given the judge's sound reasons for the remedial action taken, and the fact that it was an intermediate solution less drastic than a remedy proposed by the defendant, we discern no abuse of discretion in the judge's order suppressing Mikkelsen's testimony. We consequently affirm the judge's orders suppressing this testimony.

*So ordered.*

---

[20]The Commonwealth argues that suppression of the Mikkelsen testimony "approaches the equivalent of dismissal." But as the Commonwealth itself notes, it has available to it testimony of Mikkelsen's brother, the coowner of Strand's. We note further that the documentary record in this case is not insubstantial and that various witnesses beyond Mikkelsen or his brother would apparently be available to the Commonwealth.